The **STATE OF IDAHO**, Idaho Transportation Department, ex rel. Carl C. Moore, Lloyd F. Barron and Roy I. Stroschein, Idaho Transportation Board, Plaintiffs,

v.

**OREGON SHORT LINE RAILROAD COMPANY**, a Utah corporation, and Union Pacific Railroad Company, a Utah corporation, Defendants,

Blaine County, City of Ketchum and City of Hailey, M'Lynn Childers, Joan K. Janoe, John F. Schwartz and Clarise M. Schwartz, husband and wife, and all other individuals and organizations similarly situated, Intervenors.

Civ. No. 83–1473.

United States District Court, D. Idaho.

May 1, 1985.

Robert L. Trabert, Chief Legal Counsel, Patrick W. Fanning, Leonard G. Hill, Idaho Transp. Dept., Boise, Idaho, for plaintiffs State of Idaho, Idaho Transp. Dept. ex rel. Carl C. Moore, Lloyd F. Barron and Roy I. Stroschein, Idaho Transp. Bd.

Duane A. Bybee, Green, Service, Gasser & Kerl, Pocatello, Idaho, for defendants Oregon Short Line R. Co., Union Pacific R. Co.

James W. Phillips, Ketchum City Atty., Ketchum, Idaho, for intervenor City of Ketchum.

Sandra Shaw, Pros. Atty., Russell G. Pinto, Sp. Deputy Pros. Atty., Hailey, Idaho, for intervenor City of Hailey and Blaine County, Idaho.

John C. Ward and Brian R. Hanson, Holland & Hart, Langroise, Sullivan & Smylie, Boise, Idaho, for intervenors M'Lynn Childers, Joan K. Janoe, John F. Schwartz and Clarise M. Schwartz.

## MEMORANDUM DECISION

CALLISTER, Chief Judge.

Before the Court are three motions: (1) Defendants' motion to amend order and to strike complaint of intervenors Childers et al.; (2) Intervenor Blaine County's motion for partial summary judgment; and (3) Defendants' motion for summary judgment. Counsel for the parties presented oral argument on these matters on April 5, 1985, and the Court has reviewed the memoranda submitted as well as all other materials on file in this case.

The following is a brief summary of the factual and procedural history of this case.

This is a suit for declaratory relief brought by the State of Idaho, Idaho Transportation Department, and Idaho Transportation Board against two railroad company defendants, the Oregon Shortline Railroad Co. and the Union Pacific Railroad Company, both of which are Utah corporations. Jurisdiction is based on diversity.

The plaintiffs' complaint alleges that the defendants presently hold title to a 54.19 mile strip of railroad land extending from Richfield, Idaho, to Ketchum, Idaho (referred to as the "Ketchum Branch"). The strip of land comprises approximately 1,207 acres. Of the 1,207 acres, 985 acres were acquired by the defendant railroad companies from the United States Government under the 1875 General Railway Right-of-Way Act for use as a railroad right-of-way. Plaintiffs allege that in May of 1982, the defendants applied, as required by federal law, to the Interstate Commerce Commission (ICC) for authorization to abandon the Ketchum Branch due to lack of traffic. They further allege that in June of 1982, the ICC authorized the abandonment and discontinuance of service. Under the terms of the ICC ruling, the railroads were required to notify the ICC in writing within one year if "actual" abandonment were to take place—otherwise the authorization would be revoked. In June of 1983, the defendants gave notice in writing that they had chosen not to proceed with actual abandonment but stated that they instead desired to convert the line to sidetrack; the defendants are presently using the track for storage purposes.

The State of Idaho has portions of three state highways which run parallel to the Ketchum Branch and the State has expressed interest in the railroad property. The State wishes to widen the highways using the railroad property. Plaintiffs began negotiating with defendants to acquire the land but a controversy arose as to the character and extent of the railroads' interest in the lands and as to whether the defendants had abandoned the Ketchum Branch. In their complaint, plaintiffs state that they do not wish to pay the $5.5 million asking price of the defendants but

instead wish to acquire the property as "abandoned property" under 43 U.S.C. § 912. The plaintiffs claim that on March 9, 1983, they declared their intent to embrace the land as public highway under the requirements of § 912.

In their first cause of action, the plaintiffs seek a declaration from this Court as to whether the defendants have abandoned the Ketchum Branch under § 912 and what acts would constitute abandonment. Plaintiffs also ask the Court to define the acts necessary for the State to embrace the land. In their second cause of action, plaintiffs ask the Court to determine whether the defendants are otherwise restricted from conveying good title to the land to the plaintiffs under 43 U.S.C. § 912. Plaintiffs seek a declaration "[e]stablishing defendants' rights to transfer to plaintiff pursuant to 23 United States Code Section 316 as limited by 43 United States Code Section 913...." Plaintiffs' complaint, p. 7.

Shortly after the plaintiffs' complaint was filed, three parties moved to intervene and were allowed to do so by the Court. Those intervenors are Blaine County, the City of Ketchum, and the City of Hailey. Each of the intervenors filed a complaint for declaratory relief contending that a portion of the Ketchum Branch runs through its city or county boundaries and asking the Court to declare that defendants have abandoned the portion of property within the intervenors' boundaries under § 912 and that title is therefore vested in the respected intervenor. In the alternative, intervenors ask the Court to declare that any conveyance by the defendants to the intervenors would constitute abandonment by the defendants and/or would convey all right and title to the property to the intervenors.

On December 28, 1984, a motion to intervene was filed by M'Lynn Childers, Joan K. Janoe, John F. Schwartz, and Clarise M. Schwartz, individually, and on behalf of all individuals and organizations similarly situated. At a hearing held January 15, 1985, the Court granted this motion to intervene

for the limited purpose of litigating the issues already before the Court.

*Defendants' Motion to Amend Order and to Strike Complaint of Intervenors Childers et al.*

The Court stated from the bench that it would strike counts two and three from the complaint of intervenors Childers et al. Further, the Court indicated that at this time no ruling would be made on the question of class certification.

*Intervenor Blaine County's Motion for Partial Summary Judgment.*

Blaine County's motion for partial summary judgment presents the purely legal question of whether 43 U.S.C. § 912 applies to railroad rights-of-way granted under 43 U.S.C. § 934 et seq., the General Railway Rights-of-Way Act of 1875 (1875 Act). Blaine County argues that § 912 does apply to 1875 Act rights-of-way. As a corollary to its argument, Blaine County also asserts that 23 U.S.C. § 316 must apply if § 912 does; in other words, either both provisions apply or neither does. Blaine County's position is adopted by the plaintiffs, intervenor City of Hailey and intervenor City of Ketchum. The defendant railroads do not appear to reach the question of whether § 912 applies, but instead argue that § 912 does not apply because no abandonment has occurred under the facts of this case. Thus, defendants, as the Court understands their position, do not accept or deny the threshold applicability of § 912 to 1875 rights-of-way.

The only parties, then, contesting the applicability of § 912 are intervenors Childers et al. They argue that §§ 912 and 316 apply only to pre-1871 rights-of-way and not to 1875 rights-of-way. These intervenors contend that the pre-1871 rights-of-way gave railroads a fee simple interest subject to a reversion in the United States Government. Post-1871 rights-of-way gave railroads only an easement interest which, upon its termination by abandonment or other means, merely unburdens the underlying servient estate, without any reversion to the Government. Thus, these intervenors contend that §§ 912 and 316 were

not necessary as to the post-1871 grants because no reversionary interest exists.

This Court is of the opinion that § 912 does apply to 1875 Act rights-of-way.

From 1850 to 1871, Congress subsidized railroad construction through large grants of public lands. *Great Northern Railroad Co. v. United States,* 315 U.S. 262, 263, 62 S.Ct. 529, 533, 86 L.Ed. 836 (1942). In 1871, Congress, with a finger to the prevailing winds of public opinion, changed this policy and discontinued outright grants of land to railroads. *Id.* Congress, however, still intended railroads to have exclusive use and possession of railroad rights-of-way. This may be inferred from the continued use of the term "right-of-way" in the 1875 Act and from the fact that railroads must have exclusive use of their rights-of-way in order to function. The term "right-of-way," in the context of railroad property interests, is a term of art signifying an interest in land which entitles the railroad to the exclusive use and occupancy in such land. *See* 65 Am.Jur.2d § 73 at p. 385 (1972), and cases cited therein. Because exclusive use and occupancy are not rights comprised within the traditional definition of an easement, definitional problems later arose in describing the nature of the railroad's interest in its right-of-way. *See, e.g., State of Wyoming v. Udall,* 379 F.2d 635 (10th Cir.1967).

From 1871 to 1875, Congress passed special acts which granted rights-of-way to railroads on an individual basis. This practice becoming overly burdensome, Congress passed the 1875 Act, a general act, which reads, in pertinent part:

> The right-of-way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any state or territory, except the District of Columbia, or by the Congress of the United States ... to the extent of one hundred feet on each side of the central line of said road....

43 U.S.C. § 934.[1]

The *Great Northern* case, *supra,* contains extensive discussion of the legislative and administrative history of the 1875 Act. 315 U.S. at 273–76, 62 S.Ct. at 533–35. From this vantage point on history, it is clear that the 1875 Act was not intended to grant a fee interest to railroads. *See, e.g.,* Cong.Rec., 43rd Cong.2d Sess., vol. 3, pp. 404–06. It is apparent, however, from *Great Northern's* review of the administrative history of the 1875 Act that there were definitional problems in defining the exact nature of the railroads' right-of-way interest, as mentioned above. For example, in some administrative statements the railroads' interest is called an easement, in others, a right-of-way, and in others, a limited fee. *Id.* at 275–76, 62 S.Ct. at 534–35.

In 1903, the United States Supreme Court ruled that an 1864 Act railroad right-of-way conveyed a "limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Townsend, supra,* 190 U.S. at 271, 23 S.Ct. at 672. In 1915, in *Rio Grande Western Railroad Co. v. Stringham,* 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136 (1915), the Court, this time interpreting an 1875 Act right-of-way, adopted once again the use of the "limited fee" concept in reliance on *Townsend* and other decisions. *Townsend, Stringham* and these decisions were attempts to define the property interest conveyed to a railroad by the grant of a right-of-way—the result being a rather unartful coinage of the term "limited fee with an implied condition of reverter," something of a hybrid between a fee simple interest and a mere easement interest.

The definitional problems underlying the use of the "limited fee" language has been commented on by the Tenth Circuit Court of Appeals:

> *Pacific Railway Co. v. Townsend,* 190 U.S. 267, 268, 23 S.Ct. 671, 671, 47 L.Ed. 1044 (1903) (1864 Act).

---

1. The operative language in the 1875 Act was virtually identical to that of most or all of the pre-1871 acts: *State of Wyoming v. Udall, supra,* 379 F.2d at 638, note 5 (1862 Act); *Northern*

The concept of "limited fee" was no doubt applied in *Townsend* because under the common law an easement was an incorporeal hereditament which did not give an exclusive right of possession. With the expansion of the meaning of "easement" to include, so far as the railroads are concerned, a right in perpetuity to exclusive use and possession the need for the "limited fee" label disappeared. *State of Wyoming v. Udall, supra,* 379 F.2d at 640.

In *Stringham, supra,* the court dealt with statutory language in the 1875 Act that was identical to the language of the 1864 Act examined in the *Townsend* case; both the 1864 and 1875 Acts granted a "right-of-way" with no other limiting language. The 1862 Act likewise granted a right-of-way employing identical language. Thus, by the early 1920's, the Supreme Court interpreted post-1871 rights-of-way to be "limited fees."

Building on the foundation formed by these Supreme Court decisions, Congress, in the early 1920's, passed a series of statutes intended to dispose of these "implied reverters", which it believed the United States Government held in railroad rights-of-way. At least three statutes, and possibly others, were enacted in order to carry out this purpose. Title 43, section 912, passed in 1922, purports to dispose of railroad rights-of-way where there has been abandonment or forfeiture; 43 U.S.C. § 913, passed in 1920, purports to allow railroads to convey portions of their rights-of-way though not so as to diminish the right-of-way to less than one hundred feet, in total; 23 U.S.C. § 316, passed in 1921, purports to allow a railroad to convey any part of its right-of-way to state highway departments or their nominees.

The legislative history surrounding these statutes, particularly §§ 912 and 913, clearly shows that in enacting these provisions Congress was acting on the assumption that the United States possessed some type of reversionary or other interest in railroad rights-of-way—this assumption being based on the "implied condition of reverter" language in *Townsend, Stringham* and other decisions. H.R.Rep. No. 217, 67th Cong., 1st Sess. 1 (1921); H.R.Rep. No. 843, 66th Cong., 2d Sess. 2 (1920).[2]

In 1942, the United States Supreme Court modified its view of 1875 Act rights-of-way, and acted to remove the above-mentioned definitional difficulties by holding that such rights-of-way were only easements and not fee interests. To that extent, the *Stringham* case was thereby overruled. *Great Northern, supra.*

It is important to note exactly what the *Great Northern* court decided and did not decide. In that case, the United States, as owner of the underlying lands, brought suit to enjoin the defendant railroad company from extracting minerals from the government lands which underlay the railroad company's right-of-way. The right-of-way had been granted under the 1875 Act. The Supreme Court allowed the injunction to issue against the railroad company and held that the minerals underlying the right-of-way belonged to the United States as owner of the underlying lands. 315 U.S. at 270–72, 62 S.Ct. at 532–33. Thus, the case stands only for the proposition that a railroad does not have the right to the minerals beneath the right-of-way because the 1875 Act did not convey the underlying fee. Other than merely denominating the railroad's interest as an "easement," however, the Court provided no discussion as to the nature of the railroad's right-of-way interest under the 1875 Act and whether Congress had retained some interest in railroad rights-of-way under the 1875 Act or subsequent legislation.

Noticeably absent from the *Great Northern* opinion is any discussion of §§ 912 or 913 and their respective legislative histories, referred to above. The *Great Northern* court left the *Townsend* decision intact

---

**2.** Legislative history involving § 316 is scant. The Court believes, however, that this provision supports the discussion in the text because, in its original form, § 316 was part of a comprehensive federal highway act, *see* 42 Stat. 212, 216 (1921), and because § 316 was enacted at the same time as §§ 912 and 913.

on the ground that it concerned pre-1871 rights-of-way, but overruled *Stringham* because it dealt with a post-1871 right-of-way. The Court failed to recognize that the pre-1871 and post-1871 acts contained identical language. Further, the pre-1871/post-1871 dichotomy was significantly undercut by a subsequent Supreme Court decision in *United States v. Union Pacific Railroad Co.*, 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957) reaching the same result as in *Great Northern* though interpreting an 1862 Act right-of-way.[3]

■ This rather involved survey of the legislative history, statutes, and cases leads the Court to the following conclusions: First, Congress, in granting the 1875 Act rights-of-way, did not intend to convey to the railroads a fee interest in the underlying lands. Congress did, however, intend to give the railroads an interest suitable for railroad purposes—a right-of-way, which, by definition, carried with it the right to exclusive use and occupancy of the land. The above conclusion is in accord with sound statutory construction in that statutes should be interpreted so as to effectuate, to the full extent, legislative policymaking. *Great Northern, supra*, 315 U.S. at 272, 62 S.Ct. at 533.

As previously indicated, under traditional rules, a simple easement carries with it no right to exclusive use and occupancy of the land. Even if the 1875 Act granted only an easement, as opposed to a higher right-of-way interest, Congress had authority, by virtue of its broad power over interstate commerce, to grant such easements subject to its own terms and conditions—which were to preserve a corridor of public transportation, particularly the railroad transportation, in order to facilitate the development of the "Western vastness."[4] Congress could pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests. In other words, even if the 1875 Act grant-

ed only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement. This is consistent with another well-settled rule of statutory construction which provides that conveyances by the Government will be strictly interpreted against the grantee and in favor of the grantor. *Union Pacific, supra*, 353 U.S. at 116, 77 S.Ct. at 687; *Great Northern, supra*, 315 U.S. at 272, 62 S.Ct. at 533.

■ Second, as the Supreme Court stated in the *Great Northern* decision,

It is settled that subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.

*Great Northern, supra*, 315 U.S. at 277, 62 S.Ct. at 535. This Court has the obligation to interpret § 912 (and §§ 913 and 316) in such a way to fully effectuate congressional intent: These statutes would be rendered null if this Court were to find them inapplicable to 1875 Act rights-of-way, for they were specifically enacted to dispose of the United States' retained interest in 1875 Act rights-of-way. *See* H.R. 217 and 843, *supra*. In enacting these statutes, Congress clearly felt that it had some retained interest in railroad rights-of-way. The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law. Based on *Townsend, Stringham* and other decisions, congressional committeemen in the early 1920's spoke of this retained interest in terms of an "implied condition of reverter." Regardless of the precise nature of the interest, Congress clearly believed that it had authority over 1875 Act railroad rights-of-way. Sections 912, 913 and 316 evince an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation. With the relatively recent advent of the automobile, the 66th and 67th Con-

---

3. The *Union Pacific* Court's decision was in part based on the "mineral lands" exception in § 3 of the 1862 Act, but the Court did attempt to distinguish the *Townsend* line of decisions. *Id.* at 118, 77 S.Ct. at 688.

4. An examination of the congressional debate on the 1875 Act reveals that there was extensive discussion of Congress' continuing commerce power over railroad rights-of-way. Cong.Rec., 43rd Cong.2d Sess., vol. 3, pp. 404–06.

gresses obviously perceived the rising importance of highway transportation; and acted to preserve, where possible, railroad rights-of-way for such use. For primarily that purpose, §§ 912, 913 and 316 were enacted.

In conclusion, the Court finds that §§ 912 and 316 apply to 1875 Act rights-of-way.

*Defendants' Motion for Summary Judgment.*

In its order dated April 5, 1985, the Court, based on the agreement of all parties, determined that the factual issue of abandonment would be decided by the submission of statements of fact, affidavits, and other supporting documentation and that there would be no need for a trial as to this issue. The parties shall have twenty (20) days from the date of this order in which to submit this factual material.