Helen S. BARNEY and Margret C.H. Barney; Florence L. Kaubisch; Lester F. Hall and Araden J. Hall Trust; Roy Schiefer and Betty Schiefer, husband and wife; Charley C. Pinson and Anna M. Pinson, husband and wife; and William and Ina Mae Oerlline, husband and wife, Plaintiffs and Appellants,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, INC., United States of America, and all persons unknown who have or claim to have any interest of estate, or lien or encumbrance in or upon the premises described in the complaint, Defendants,

and

State of South Dakota, Intervenor–Defendant and Appellee.

No. 17672–a.

Supreme Court of South Dakota.

Argued April 21, 1992.

Decided Sept. 9, 1992.

JUDITH MEIERHENRY, Circuit Judge.

Landowners seek to quiet title to a railroad right-of-way running across their lands from Custer to Deadwood, South Dakota. The State of South Dakota (State) claims it is entitled to the right-of-way. The landowners claim that the State's conversion of the right-of-way into recreational trails is a taking of their reversionary interests deserving of compensation from the State.

## FACTS

Congress under the provisions of the General Right–of–Way Act of 1875, 43 U.S.C. § 934,[1] granted right-of-way corridors across public lands to the Grand Island and Wyoming Central; Burlington and Missouri; and Chicago Burlington and Quincy Railroads. The rights-of-way crossed public lands in the Black Hills of South Dakota. The United States Government subsequently conveyed the underlying patented lands subject to the railroad rights-of-way. Helen and Margret Barney, Florence Kaubisch, Lester Hall and M/Bank, as Trustees, Roy and Betty Schiefer, Charley and Anna Pinson, and William and Ina Oerlline (Landowners) are the successors in interest to those land patents. The Burlington Northern Railroad (Railroad) is the successor in interest to the railroad rights-of-way.

On August 1, 1983, the Railroad filed an application with the United States Interstate Commerce Commission (I.C.C.) requesting a certificate of public convenience and necessity allowing the Railroad to abandon its lines between Hill City and Deadwood, South Dakota. The I.C.C. issued a certificate and decision on September 9, 1983, granting the Railroad the authority to abandon the lines. On January 23, 1984, the Railroad informed the I.C.C. that actual abandonment of the lines was effected on January 13, 1984.

Beginning in the summer of 1983, the State through the Department of Game, Fish, and Parks expressed interest in devel-

Scott D. McGregor of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for plaintiffs and appellants.

Mark Barnett, Atty. Gen., Craig M. Eichstadt, Asst. Atty. Gen., Pierre, for intervenor-defendant and appellee.

Reed C. Richards, Deadwood, for amici curiae Black Hills Rails to Trails Ass'n, South Dakota Park and Recreation Owners Ass'n, Black Hills Volkssport Ass'n, South Dakota Snowmobile Ass'n, Missouri Breaks Chapter of the Nat. Audubon Soc., and Rails to Trails Conservancy.

---

1. Originally enacted as The General Railroad Right–of–Way Act of March 3, 1875, ch. 152, § 1, 18 Stat. 482, *repealed by* Pub.L. No. 94–579, 90 Stat. 2793 (1976).

oping the right-of-way for recreational trails. The State planned to develop the recreational trails primarily for pedestrian, bicycle, horse, cross-country skiing, and snowmobiling. In 1986, the State, along with the Black Hills Rails–to–Trails Association, began negotiating with the Railroad. In 1988 and 1989, the State and the Railroad entered into agreements whereby the Railroad agreed to donate to the State all of its right, title and interest to the right-of-way from Custer to Deadwood, South Dakota.

On October 9, 1987, Landowners, claiming title to the right-of-way, filed a quiet title action.[2] The Landowners were not attempting to prevent the development of the recreational trail or to challenge the desirability of the recreational trail. The Landowners' request was for compensation. The State intervened and moved for summary judgment. The parties agreed that there were no issues of material fact, and on July 24, 1991, the trial court granted summary judgment to the State. The trial court determined that the Railroad right-of-way and its abandonment are governed by 43 U.S.C. § 912 (§ 912) requiring either a declaration or decree of abandonment by a court of competent jurisdiction or an act of Congress. The trial court also determined that the I.C.C.'s certificate and approval of abandonment did not amount to a congressional decree of abandonment under § 912 and that abandonment occurred upon the trial court's decree. The trial court further found that the Landowners' reversionary interest did not vest because the State developed "a public highway," i.e., a public recreational trail within the one year period required by § 912 and SDCL 49–16A–115; therefore, no taking occurred, and the Landowners were not entitled to compensation. We agree.

### ISSUES

#### I.

WHETHER § 912 APPLIES TO THE RIGHT–OF–WAY GRANTED TO THE RAILROAD?

#### II.

IF SO, WHETHER THE RAILROAD'S RIGHT–OF–WAY HAS BEEN LEGALLY ABANDONED UNDER THE PROVISIONS OF § 912 EITHER BY AN ACT OF CONGRESS OR A DECREE OF A COURT OF COMPETENT JURISDICTION AND WHETHER THE STATE'S PROPOSED RECREATIONAL TRAIL ALONG THE RAILROAD RIGHT–OF–WAY CONSTITUTES THE ESTABLISHMENT OF A PUBLIC HIGHWAY WITHIN ONE YEAR OF ABANDONMENT?

#### III.

WHETHER THE LANDOWNERS ARE ENTITLED TO COMPENSATION FROM THE STATE FOR THE STATE'S TAKING OF THEIR INTEREST IN THE RAILROAD RIGHT–OF–WAY?

### ANALYSIS

#### I. APPLICATION OF § 912

The Landowners claim that rights-of-way granted by the United States to the railroads under the 1875 Act are common law easements which automatically extinguish and revert to the underlying landowner when they cease to be used for railroad purposes and that the rights-of-way are not subject to the reversion provisions of § 912. Section 912 provides:

Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, ... by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all

---

**2.** The Railroad and the United States of America were both named in the quiet title action and later dismissed from the case.

right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted....

The historical background of § 912 begins with the role of Congress in railroad development. Beginning in 1850 Congress, for the first time, enacted a bill that explicitly granted public lands to aid construction of a cross-country railroad. Act of Sept. 20, 1850, 9 Stat. 466. First, lines were built connecting the southern states with Illinois. Then, spurred by the California gold rush and the Civil War, Congress wanted the railroads to expand to provide passage to the western United States. Congress gave generous land grants from the public domain to the railroads to subsidize the costs of the western expansion. The Union Pacific Act of 1862 created the impetus to begin laying track from the 100th meridian, a point in the Platte River Valley near Kearney and North Platte, Nebraska, to California. Act of July 1, 1862, 12 Stat. 489; *see, Leo Sheep Co. v. United States,* 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979).[3]

In 1872, Congressional policy changed; the House of Representatives enacted a resolution condemning its policy of outright land grant subsidies to railroads. *Leo Sheep Co., supra.* Congress, instead, reserved the land for homesteads and educational purposes. *Great Northern R. Co. v. United States,* 315 U.S. 262, 273–4, 62 S.Ct. 529, 533–4, 86 L.Ed. 836 (1942). Nevertheless, Congress continued to encourage development of the west and enacted the General Railroad Right–of–Way

Act in 1875 (1875 Act) which gave easements to railroads across public lands. 43 U.S.C. § 934. The right-of-way at issue in this case was granted by the 1875 Act.

Subsequently, the United States transferred much of the underlying lands to homesteaders and others subject to the railroad rights-of-way. In the early 1920's, Congress passed statutes designating procedures for distribution of the rights-of-way when the railroads abandoned their lines. 43 U.S.C. § 913 (1920), 43 U.S.C. § 912 (1922), 23 U.S.C. § 316 (1921).[4]

The Landowners contend that § 912 applies only to reversionary rights held by the United States and that the 1875 Act left no retained interest with the United States.[5] The nature of the property interest held by the United States Government, the Landowners or the Railroad is defined and controlled by federal legislation and is, therefore, a federal question. *Northern P.R. Co. v. Townsend,* 190 U.S. 267, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). The U.S. Supreme Court defined the right-of-way interest conveyed to the railroads as a "limited fee, made on an implied condition of reverter." *Id.* 190 U.S. at 271, 23 S.Ct. at 672, 47 L.Ed. at 1047; *Rio Grande Western R. Co. v. Stringham,* 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136 (1915).

The U.S. Supreme Court in 1942 in *Great Northern, supra,* further defined the nature of the property right given to the railroads by the 1875 Act. The Court determined that Congress conveyed an easement, not a fee simple in the right-of-way. The U.S. Supreme Court discussed the nature of the property interest conveyed by the 1875 Act in *Great Northern* but did not address the applicability of the reversion procedures in §§ 912 or 913. The main question before the Court in *Great Northern* was whether the United States conveyed a fee title to the railroads by the

**3.** Chief Justice Rehnquist writing for the Court unfolds a colorful history and background of this period.

**4.** *See generally,* Note, Reversion of Railroad Right of Way in South Dakota After Haack v. Burlington Northern, Inc., 28 S.D.Law Rev. 196 (Winter 1982).

**5.** Landowners rely upon *City of Aberdeen v. Chicago & North. Transp.,* 602 F.Supp. 589 (D.C.S.D.1984) in which Judge Porter held that § 912 did not apply to railroad easements granted under the 1875 Act. We do not adopt the reasoning of the *Aberdeen* case.

1875 Act. *Great Northern* stands only for the proposition that the underlying landowner—the U.S. Government—owned the mineral rights beneath the right-of-way. *See also, United States v. Union P. R. Co.,* 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957). Reversionary interests in the right-of-way of a third party adjoining landowner or even the United States Government were not at issue in *Great Northern.*

A recent federal case which addressed the issue of reversionary interests in abandoned railroad rights-of-way is *Vieux v. East Bay Regional Park Dist.,* 906 F.2d 1330 (1990), *cert. denied* 498 U.S. ——, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990). The *Vieux* court determined that § 912 applied to 1875 grants:

> In 1922, Congress passed 43 U.S.C. § 912 (Disposition of Abandoned Railroad Grants) as part of the Public Lands Act to ensure that railroad rights of way would continue to be used for public transportation purposes. Although the U.S. Supreme Court has not addressed whether the change in 1871 in the nature of the grants, from "limited fee with right of reverter" to "exclusive easement," affects the application of § 912, we agree with the district court's Memorandum and Order of March 2, 1987, in that the statute applies to grants both before and after 1871. (citation omitted).

*Id.* 906 F.2d at 1335.

■ The easement granted by Congress is an easement subject to the intentions and specifications of Congress; it is not a common law easement.

> Congress could pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests. In other words, even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement.

 •    •    •    •    •

The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law.

*State of Idaho v. Oregon Short Line R. Co.,* 617 F.Supp. 207, 212 (D.C. Idaho 1985) (*Idaho I*). It is clear from the legislative history that Congress assumed it possessed some type of reversionary or other interest in the railroad rights-of-ways. H.R.Rep. No. 217, 67th Cong., 1st Sess. 1 (1921); H.R.Rep. No. 843, 66th Cong., 2d Sess. 2 (1920) cited in *Idaho I,* 617 F.Supp. at 211.

■ Under the broad power over interstate commerce, Congress has authority to grant railroad easements subject to its own terms and conditions. Congress wanted to preserve a corridor of public transportation, especially the railroad transportation, for further development of the western United States. Congress kept an interest in the railroad easements in order to influence future development and eventual disposition. *Idaho I, supra.*[6] The Nation's railway system reached its peak of 272,000 miles in 1920 and has steadily declined.[7] Fewer than half of those miles are in use today. As travel shifted from railways to highways, Congress turned its attention to preserving public highways. The Congressional Record which accompanied the enactment of § 912 shows Congress's intent to preserve railroad corridors for "public highway" use.

> The attention of the committee was called to the fact that in some cases highways have been established on abandoned rights-of-way and it might be desirable to establish highways on such as may be abandoned in the future. Recognizing the public interest in establishment of roads, your committee safeguarded such rights by suggesting the amendments above referred to protecting not only roads now established, but giving the public authorities one year's time

---

**6.** "An examination of the congressional debate on the 1875 Act reveals that there was extensive discussion of Congress' continuing commerce power over railroad rights-of-way. Cong.Rec., 43rd Cong.2d Sess., vol. 3, pp. 404–06." *Idaho I,* 617 F.Supp. at 212 n. 4.

**7.** See authorities cited in Comment, *Rails to Trails: Converting America's Abandoned Railroads Into Nature Trails,* 22 Akron L.Rev. 645, 645 (1989).

after a decree of forfeiture or abandonment to establish a public highway upon any part of such right-of-way.

S.Rep. No. 338, 67th Cong., 2nd Sess. 1 (1922). Congress also encouraged the development of highways by the language of 23 U.S.C. § 316 enacted in 1958 which reads:

> For the purposes of this title the consent of the United States is given to any railroad or canal company to convey to the State highway department of any State, or its nominee, any part of its right-of-way or other property in that State acquired by grant from the United States.

█ In interpreting statutory language, conveyances by the government are to be construed to carry out the intent of the grantor. To ascertain Congressional intent we must look to the condition of the country when the acts were passed and the purpose as declared on the face of the act and read all parts together. *Leo Sheep Co., supra.* To say that § 912 does not apply to the easements granted under the 1875 Act would, in effect, nullify the intent of Congress.

> These statutes [43 U.S.C. §§ 912, 913 and 23 U.S.C. 316] would be rendered null if this Court were to find them inapplicable to 1875 Act rights-of-way, for they were specifically enacted to dispose of the United States' retained interest in 1875 Act rights-of-way. [See H.R.Rep. No. 217, 67th Cong., 1st Sess. 1 (1921); H.R.Rep. No. 843, 66th Cong., 2d Sess. 2 (1920).]

*Idaho I,* 617 F.Supp. at 212. We conclude that the United States Government retained a reversionary interest in railroad rights-of-way, including those granted post 1871 and that § 912 applies to the right-of-way granted to the Railroad.

## II. ABANDONMENT AND REVERSION UNDER § 912

### A. *Decree by Court or Act of Congress*

█ Having determined that § 912 applies to the abandonment and reversion of the right-of-way, this court must then determine if the statutory requisites were met. We adopt the test used in *Vieux:* "[i]n order for reversionary rights to vest under § 912, the railroad must 1) cease 'use and occupancy' of the rights of way and 2) abandonment must be 'declared or decreed' by a court of competent jurisdiction or a congressional act." *Vieux,* 906 F.2d at 1337.

█ There is no dispute that the railroad has ceased to use or occupy the right-of-way as required by the statute. The issue lies with the second part of the test. The Landowners contend that Congress has delegated its authority to supervise and regulate railroad abandonments to the I.C.C. and that the I.C.C.'s authorization of abandonment falls within § 912 as an "Act of Congress."[8] Legislative history makes it clear that Congress intended that any reversion or forfeiture of the rights-of-ways must be decided by a court or special act of Congress. During House debate, Representative Christopherson of South Dakota, a manager for the bill, explained the amendment which required abandonment to be "declared or decreed by a court of competent jurisdiction or by act of Congress." The text of the Congressional Record reads as follows:

> MR. GARD. The objection which was in my mind was that without any process by anybody, except the proof of the matter of abandonment, the title to this land vested in some subdivision which was outside a municipality, and simply because a man might own a piece of ground contiguous to this abandoned

**8.** Landowners cite *Harris v. Ski Park Farms, Inc.,* 62 Wash.App. 371, 814 P.2d 684 (1991) as authority. The issue in *Harris* was construction of a deed which conveyed adjacent property excepting the railroad right-of-way which had been abandoned prior to the transfer. The *Harris* court concluded that the I.C.C. authorization of abandonment was sufficient to meet the statutory requirements of § 912. The *Harris* decision is limited to interpreting the language of a deed and the intention of the conveying party. There was no attempt by the state or anyone else to establish a public highway along the right-of-way. We find that *Harris* is distinguishable.

land, by virtue of the ownership and no other action he became entitled to this abandoned land. It seems to me there ought to be some approval by some one who has charge of the land rather than have the automatic addition to the man's own land.

MR. CHRISTOPHERSON. This does not do that automatically. The bill was originally drawn so that it would automatically do it, but by the suggestion of the department there was a committee amendment which has been submitted by the committee and which I will read— whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by act of Congress.

With that amendment the parties would either have to go into court and get a decree declaring the land forfeited in a competent court *or by a special act of Congress.* We should also bear in mind that this does not operate upon any railroad lands, excepting those that have been granted by the Government for railroad purposes alone, ...

Cong.R.House 8046 (May 31, 1920) (emphasis added). The legislative history indicates that Congress did not intend to delegate its abandonment authority to the I.C.C.

We adopt the reasoning of the Ninth Circuit U.S. Court of Appeals in *Vieux:*

[T]he I.C.C. approval of abandonment, even in formal abandonment proceedings, is only a determination that under its Congressional mandate, cessation of service would not hinder I.C.C.'s purposes. It is not a determination that the railroad has abandoned its lines. Lastly, the only remedy for an "illegal" abandonment, that is one that is not approved by the I.C.C., is an injunction brought by the I.C.C., the U.S. or a state government. Thus, a railroad could abandon without any involvement from the I.C.C., if there is no injunctive action brought and if a court decrees that the railroad has abandoned the line. The I.C.C. regulations and process determine what effects an abandonment will have and what the railroad must do to counteract those effects before it abandons, but they do not determine that an abandonment has actually occurred. (citations omitted)

*Vieux,* 906 F.2d at 1339. *See, State by Wash. Wildlife Preservation v. State,* 329 N.W.2d 543 (Minn.1983), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983). We agree with the trial court that the right-of-way in the present case was not legally abandoned until the trial court so decreed.

### B. *Establishment of a Highway Within One Year of Abandonment*

■ The Landowners contend that a recreational trail as proposed by the State is not a public highway within the meaning of § 912. State law determines what constitutes a "public highway legally established" for purposes of federal land grant statutes, including § 912. *Standage Ventures, Inc. v. Arizona,* 499 F.2d 248 (9th Cir.1974) cited in *Vieux,* 906 F.2d at 1341.

■ A public highway is defined as "a passage or road which 'every citizen has a right to use.'" *Lawrence v. Ewert,* 21 S.D. 580, 583, 114 N.W. 709, 710 (S.D.1908). South Dakota law defines "highway" as "[e]very way or place of whatever nature open to the public, as a matter of right, for purposes of vehicular travel." SDCL 31-1-1; *Dave Gustafson & Co. v. State,* 84 S.D. 238, 242, 169 N.W.2d 722, 724–725 (S.D. 1969). Vehicles may include snowmobiles and bicycles. SDCL 32-14-1. Federal law specifically recognizes and authorizes the conversion of railroad rights-of-way to recreational trails in the Trails Act 16 U.S.C. §§ 1241 et seq.[9] The recreational trail proposed by the State is open to the public for snowmobiling and bicycling and, therefore, falls within the definition of highway under state law. The State established the trail within the one year statutory period.

### III. COMPENSATION

The railroad right-of-way is preserved as a public transportation corridor in accor-

---

**9.** *See* Comment, *supra* note 7.

dance with 43 U.S.C. §§ 912 and 913, 23 U.S.C. § 316 and South Dakota statutory law, SDCL 49–16A–115. The Landowners contend that the State has taken their reversionary interest for use as a public recreational trail and that under the South Dakota Constitution art. VI, § 13, the State should pay compensation for the taking. Section 13 reads in part: "Private property shall not be taken for public use, or damaged, without just compensation, …"

The U.S. Supreme Court in *Preseault v. I.C.C.,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) in addressing the constitutionality of a federal "rails-to-trails" statute determined that whether or not a taking had occurred depended upon the legal status of the reversionary interest. *Id.* The South Dakota Legislature requires a railroad to settle reversionary interest title claims to right-of-way easements within one year after abandonment pursuant to federal requirements of § 912.

> A railroad which abandons service over, salvages and removes its rail, ties and other track material from any right-of-way in which it claims any right, title or interest in public lands, as prescribed by the act of Congress approved March 3, 1875, as amended, or in Indian lands as prescribed by the act of Congress approved March 2, 1889, as amended, or § 49–16A–55, shall settle title claims with adjoining landowners and municipalities within one year after salvage of the abandoned road is complete or title to the abandoned railroad right-of-way easement reverts and vests, by operation of law, pursuant to 42 Stat. 414 (March 8, 1922) [§ 912].

SDCL 49–16A–115. The state statute explicitly defers to § 912 to determine when reversionary interests vest.

Under the provisions of § 912, the Railroad has transferred the right-of-way to the State for use as a public highway. Hikers, bikers, skiers, and snowmobilers will use the right-of-way, and, as such, the right-of-way will continue to be used as a public highway compatible and consistent with its prior use as a public railway. No greater burden has been placed upon the servient estate. "It has long been held that the holder of an easement is not limited to the particular method of use in vogue when the easement was acquired, and that other methods of use in aid of the general purpose of which the easement was acquired are permissible." *Wash. Wildlife,* 329 N.W.2d at 546. The Landowners acquired the property subject to the right-of-way traversing the land. Their interest has not been diminished by converting the right-of-way to a public recreational trail. The Landowners' reversionary rights will not mature until the right-of-way ceases to be used as a public highway. Therefore, there has been no taking and the Landowners are not entitled to compensation from the State.

We affirm the decision of the circuit court on all issues.

MILLER, C.J., and WUEST, J., and McKEEVER, Circuit Judge, and STEELE, Circuit Judge, concur.

McKEEVER, Circuit Judge, for HENDERSON, J., disqualified.

STEELE, Circuit Judge, for SABERS, J., disqualified.

MEIERHENRY, Circuit Judge, for AMUNDSON, J., disqualified.