#23989-rev & rem-JKM

**2007 SD 49**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA
* * * *

CHARLES W. BROWN,                                        Plaintiff and Appellant,

      v.

NORTHERN HILLS REGIONAL
RAILROAD AUTHORITY and STATE
OF SOUTH DAKOTA,                                         Defendants and Appellees.

KARL E. EISENBACHER; DOUGLAS R.
HAYES; KRISTI JO HAYES; JOHN R.
MILLER; JEAN MILLER; STRAWBERRY
HILL MINING COMPANY; MAURICE
HOFFMAN; LAWRENCE COUNTY,
a political subdivision of the State of
South Dakota; and all persons unknown
who have or claim to have any interest
or estate in or encumbrance upon the
premise described in the Complaint
or any part thereof,                                     Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA
* * * *

HONORABLE WARREN G. JOHNSON
Judge
* * * *

KENNETH R. DEWELL of
Johnson Eiesland Law Offices                            Attorneys for plaintiff
Rapid City, South Dakota                                and appellant.

THOMAS E. BRADY of
Brady Pluimer, P.C.                                     Attorneys for defendants
Spearfish, South Dakota                                 and appellees.

* * * *

ARGUED ON NOVEMBER 28, 2006

OPINION FILED **05/16/07**

#23989

MEIERHENRY, Justice

[¶1.]     Charles W. Brown sued Northern Hills Regional Railroad Authority, et al. (NHRRA) to quiet title to a railroad right-of-way (ROW) running across his land in Lawrence County, South Dakota.  Both the railroad ROW and Brown's land originally were grants from the federal government.

[¶2.]     The railroad ROW was established by the General Railroad Right-of-Way Act of 1875 (1875 Act) (codified at 43 USC § 934), which granted right-of-way corridors across public lands to several railroads including the Fremont, Elkhorn, and Missouri Valley Railroad Company (FEMV).  Under the provisions of the 1875 Act, FEMV filed a plat and profile of a railroad from Whitewood to Deadwood, South Dakota in the United States Land Office in Rapid City, South Dakota on May 27, 1890.  FEMV subsequently conveyed its ROW to Chicago and Northwestern Railway Company (C&NW) by an indenture dated February 28, 1903.

[¶3.]     Brown's land was transferred from the United States of America by homestead patents in 1918 and 1919 under the Homestead Act of 1862.[1]  The patents granted the land to the homesteaders subject only to water rights and ditches or canals.  The patents specifically reserved these rights as follows:

> NOW KNOW YE, That there is, therefore, granted by the
> United States unto the said claimant the tract of land above
> described: TO HAVE AND TO HOLD the said tract of land, with

---

1.    On February 4, 1918, a portion of the land encompassing the ROW was conveyed to William P. Stowers under the Homestead Act of 1862.  Likewise on January 11, 1919, another portion of the land encompassing the ROW was conveyed to John Bonshack by a patent.  At all times relevant to this litigation, Brown had legal title to both portions of the patent land originally conveyed to Bonshack and Stowers.

-1-

the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; and ***there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States.***

(emphasis added).

[¶4.]    Early in the 1970s, C&NW decided to discontinue operating a railroad on the ROW traversing the Brown land. Accordingly on February 19, 1970, C&NW filed an Application for Abandonment with the Interstate Commerce Commission (ICC), which the ICC approved the following year. The ICC issued a certificate and order declaring that "the present and future public convenience and necessity permit the abandonment" of the portion of the ROW requested by C&NW. The ICC finalized the abandonment on January 18, 1971. All of the tracks were removed and the ROW area has not been used or maintained by C&NW or any other entity since 1971.

[¶5.]    On May 30, 1972, C&NW quitclaimed any rights in the ROW to the State of South Dakota for $5000. Thirteen years later in 1985, the State quitclaimed its rights to the ROW to South Dakota Game, Fish and Parks (GF&P). Sixteen years later on May 23, 2003, GF&P transferred the ROW to NHRRA.[2]

---

2.    When securing an easement over his property for a neighbor, Brown attempted to use the former ROW as part of a legal description. However, he was informed by the Lawrence County Register of Deeds that the ROW did not exist and Lawrence County refused to acknowledge this former ROW for any platting or boundary purposes. Brown subsequently traveled to Washington, D.C. to recover the complete ICC abandonment file for the

(continued . . .)

[¶6.]    Brown instituted an action to quiet title in June of 2004.[3]  Brown claimed that when C&NW ceased using the ROW for railroad services, the ROW was extinguished.  The trial court, relying on *Barney v. Burlington N. R.R. Co.*, applied the Abandoned Railroad Right of Way Act of 1922 (1922 Act) (codified at 43 USC § 912), and concluded that C&NW had not officially abandoned the ROW.  490 NW2d 726 (SD 1992).  Following a hearing on cross-motions for summary judgment, the trial court entered an order granting NHRRA, SDDOT and GF&P's Motions for Summary Judgment.  Brown raises the following issues on appeal.

## ISSUES

1.  Does 43 USC § 912 apply to this action?

2.  If 43 USC § 912 does apply, were all of the requirements met for abandonment in 1970-1971?

3.  If 43 USC § 912 does not apply, has the ROW been abandoned in fact and in law under settled federal and state law?

## STANDARD OF REVIEW

[¶7.]    Our standard of review for a grant of summary judgment is well settled.  "[W]e decide only whether genuine issues of material fact exist and

_____

(. . . continued)
   C&NW ROW that crossed his property.  Brown learned that C&NW had completed the abandonment with the ICC, but had failed to comply with 43 USC § 912, which requires either a declaration or decree of abandonment by a court of competent jurisdiction or an act of Congress.

3.    Brown named the following defendants in his complaint:  NHRRA, State of South Dakota, Karl E. Eisenbacher, Douglas H. Hayes, Kristi Jo Hayes, John R. Miller, Jean Miller, Strawberry Hill Mining Company, Maurice Hoffman, Lawrence County, and all persons unknown who have or claim to have any interest or estate in or encumbrance upon the premises described in the Complaint, or any part thereof.

whether the law was correctly applied." Johns v. Black Hills Power, Inc., 2006 SD 85, ¶4, 722 NW2d 554, 556. If we find any legal basis to support the trial court's decision, we affirm. *Id.* When the facts are undisputed, as in the present case, our review is limited to whether the trial court correctly applied the law. *Id.*

**ANALYSIS**

[¶8.]        Brown does not dispute NHRRA's claim that the 1875 Act established a ROW in favor of the railroad.[4] The provision in the 1875 Act which established the railroad easements across public lands provided as follows:

> The right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 USC § 934. Brown acknowledges that the ROW's encumbrance on the land remains until the ROW is extinguished. Brown's basic argument is that the ROW was extinguished when C&NW stopped using the ROW for railroad purposes. Brown argues that 43 USC § 912 does not apply to the facts of this case because it was not in effect in 1918 and 1919 when the government patents conveyed the

---

4.        NHRAA argues that 43 USC § 937 supports its argument that the United States intended to retain an interest in the railroad ROWs. However, NHRAA fails to cite any statutory language or authority to support this argument.

-4-

property to Brown's predecessors without reserving an interest in the ROWs. Brown argues that we should adopt the reasoning of two recent federal court decisions, which determined that because the land patents were conveyed prior to the enactment of 43 USC § 912, common law abandonment applies. *See* Beres v. U.S.*,* 64 FedCl 403 (FedCl 2005); Hash v. U.S., 403 F3d 1308 (FedCir 2005). Thus, Brown argues that our analysis should center on the language of the original patent and the 1875 Act rather than the language of 43 USC § 912.

### a. Background of Land Grants to Railroads and the 1875 Act

[¶9.] Beginning in the 1800s, Congress enacted several bills which explicitly granted public lands to railroad companies to aid the construction of a cross-country railroad. *Barney*, 490 NW2d at 729 (citing Act of Sept. 20, 1850, 9 Stat 466). Pursuant to these bills, "Congress gave generous land grants from the public domain to the railroads to subsidize the costs of the western expansion." *Id.* The expansion stretched from the 100th meridian from the middle of Nebraska to California. *Id.* Because of mounting public criticism, the nature of the land grants changed in 1872. *Id.* "[T]he House of Representatives enacted a resolution condemning its policy of outright land grant subsidies to railroads." *Id.* (citing Leo Sheep Co. v. U.S., 440 US 668, 99 SCt 1403, 59 LEd2d 677 (1979). Instead, Congress began to reserve the land for homesteads and educational purposes. *Id.* Notwithstanding this changed policy, Congress continued to encourage the expansion of the West by enacting the 1875 Act, which authorized ROW grants to railroads. *Id.* (citing 43 USC § 934). The United States Supreme Court later concluded that ROWs, granted under the 1875 Act, gave the railroad companies

easements, not fee interests, across public lands. Great N. R.R. Co. v. U.S., 315 US 262, 273-74, 62 SCt 529, 533-34, 86 LEd 836 (1942). The United States then transferred much of the underlying lands to homesteaders and others, subject to the railroads' ROWs. In the present case, the FEMV Railroad Company was granted a ROW under the 1875 Act. Also, in 1918 and 1919, Brown's predecessor in interest took the land subject to the ROW.

[¶10.]    After use of the railway system declined in the early 1920s, Congress enacted statutes to distribute "all right, title, interest, and estate of the United States" in the ROWs to the fee owner of the underlying land when railroads ceased using the ROWs. 43 USC § 912. Section 912 provided for the continuation of the ROW if "embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment."[5] *Id.*

---

5.    The relevant portion of section 912 provides:

> Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind. . . .

### b. Recent Federal Case Law

[¶11.] In two recent cases cited by Brown, federal courts have determined that the federal government failed to retain a reversionary interest in the railroad ROWs authorized in the 1875 Act. *Beres*, 64 FedCl 403; *Hash*, 403 F3d 1308. In *Beres*, landowners brought suit against the United States alleging that the government had effectuated an uncompensated taking when it sought to convert an abandoned railroad ROW into a recreational trail pursuant to 16 USC § 1247(d). 64 FedCl at 407. The court concluded that this was a compensable taking under the Fifth Amendment because the United States had failed to retain a reversionary interest in the ROW both under the 1875 Act and again when it conveyed the adjoining land by patent with no reservation of such interest. *Id*. at 428.

[¶12.] The government in *Beres* argued that easements created by the 1875 Act were tantamount to fee ownership. *See id*. at 411. The court rejected this argument and concluded that the interests were merely common law easements. *Id*. at 427. Recognizing that "nothing passes but what is conveyed in clear and explicit language," the court emphasized the following language from the United States Supreme Court: "the property interest granted in the rights-of-way 'through the public lands' to the railroads was 'only an easement.' '[T]he Act of March 3, 1875. . . clearly grants only an easement, and not a fee. . . . [T]he right granted is one of use and occupancy only.'" *Id*. (quoting *Great N. R.R. Co.*, 315 US at 271-72, 62 SCt at 532, 86 LEd 836).

[¶13.] The *Beres* court emphasized that the landowners' successors in interest had derived title from a land patent. The court noted that a land patent that is

"regular in form and for whose issuance there is statutory authority is so binding on the government that a purchaser from the patentee need make no investigation as to the details of its issuance the legal title has passed and the patent is conclusive against the government. The [government] loses its jurisdiction over the land as soon as a valid patent is issued." *Id*. at 417 (quoting U.S. v. Eaton Shale Co., 433 FSupp 1256, 1267 (DColo 1977) (alteration in the original). The land patent to Beres' land failed to reserve an interest by the United States. *Id*. Consequently, the court concluded that the United States failed to retain an interest in the ROW. The court reasoned as follows:

> [T]he United States Supreme Court recognizes the sanctity of land transfers, and has expressed reluctance to interfere with land rights in which no reservations were present when conferred, stating that: "Generations of land patents have issued without any express reservation of the right now claimed by the Government. . . . [W]e are unwilling to upset settled expectations to accommodate some ill defined power to construct public thoroughfares without compensation."

*Id*. (quoting *Leo Sheep Co*., 440 US at 687-88, 99 SCt at 1414, 59 LEd2d 677).

[¶14.] The government based its argument on the language of the 1875 Act and on the subsequent enactment of the 1922 Act, 43 USC § 912, which the government claimed demonstrated Congress' intent to retain a reversionary interest in the ROWs. *Id*. at 416-19. In regard to the language of the 1875 Act, the court concluded as follows:

> There are no words included in the 1875 Act to indicate that the railroad receives anything other than a right-of-way, in the nature of the right to traverse, as those words would be understood by a reasonable person. The concept of a reversionary right in the future is not included or even intimated in the 1875 Act. Nor is there in the 1875 Act any indication that the right transferred to the railroad is in the

-8-

nature of a fee. Furthermore, the 1875 Act contains no restrictions on future fee simple transfers of the public land through which the railroad right-of-way is granted to other government or private parties by the United States.

*Id*. at 416. As to the subsequently passed 1922 legislation embodied in 43 USC § 912, the court noted that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Id*. at 416 (quoting U.S. v. Price, 361 US 304, 313, 80 SCt 326, 332, 4 LE2d 334 (1960)). After examining the language of section 912, the court rejected the government's argument and offered the following interpretation of the federal statute:

> The 1922 Act [43 USC § 912] was restating the obvious conclusion regarding the language of the 1875 Act and other right-of-way statutes that, in the absence of additional language, a right-of-way through public lands allowed for a limited use and did not reserve any fee type interests or reversionary rights as part of that right-of-way. It would appear that the language of the 1922 Act was intended to address, clarify, and resolve issues created by the imprecise language employed by the courts on this subject in the early part of the twentieth century. . . . In the alternative, it has been suggested that the 1922 Act applied only to pre-1871 grants to railroad companies because prior to that date railroad companies were issued outright land grants, as opposed to the right-of-way granted to railroad companies after that date.

*Id*. at 419 (citing *Great N. R.R. Co.*, 315 US at 279, 62 SCt at 536, 86 LEd 836). Because the government failed to demonstrate that the United States retained a reversionary interest in the ROW, the court concluded that the United States' conversion of the ROW into a public trail constituted a taking which required compensation. *Id*. at 428.

[¶15.] Similarly, in *Hash*, the United States Court of Appeals, Federal Circuit, examined whether the railway's abandonment and subsequent conversion

of a ROW to a public trail constituted a compensable taking. 403 F3d at 1318. The government argued that various enactments, decisions, and current policy showed that the government had not intended to relinquish ownership of the land underlying the ROW. *Id*. at 1315. However, the court concluded that the landowners had originally received their land subject only to the railway's easement and the government had failed to retain an interest in the ROW. *Id*. at 1318. Although the government argued that national policy favored government ownership of land for environmental and conservation purposes, the court noted that "the property rights of these early landowners [were] governed by the law in effect at the time they acquired their land." *Id*. at 1315.

[¶16.] The government also argued in *Hash* that it retained a reversionary interest and cited section 912 as support. *Id*. at 1318. However, the court disagreed and concluded that section 912 simply "requires the United States to convey any rights it may have, to the patentee of the land traversed by the abandoned right-of-way; it does not say what rights the United States had after the land patent was granted." *Id*. The court concluded that "[n]either section 912 nor 913 purported to establish governmental ownership of land that had been granted to homesteaders subject to a right-of-way easement." *Id*. Accordingly, the court held that the United States failed to reserve an interest in the ROWs when it issued land patents to the adjoining lands without a specific reservation of an ownership interest in the previously granted ROWs. *Id*. Accordingly, the conversion of these ROWs to public trails constituted a taking. *Id*.

### c. *Barney v. Burlington N. R.R. Co.*

[¶17.]	NHRAA argues that our holding in *Barney* controls and that *Beres* and *Hash* are distinguishable. The question in *Barney* was whether the State's conversion of a railroad ROW into a recreational trail constituted a compensable taking. 490 NW2d at 728. We held it was not a taking. *Id*. *Barney* centered on whether the United States had retained a reversionary interest in easements granted to the railroad under the 1875 Act; and if so, whether the easements had been abandoned under section 912. *Id*. at 729. Our takings analysis relied on statutory interpretation and congressional intent. *See id*. at 728-30. The language of the land patents or whether the patents reserved an interest to the ROWs was not considered or addressed in *Barney*.

[¶18.]	In *Barney*, landowners claimed that the ROWs granted by the United States to railroads under the 1875 Act were common law easements which automatically extinguished and reverted to the underlying landowners when they ceased to be used for railroad purposes and were not subject to the provisions of section 912.[6] *Id*. at 728. We rejected the landowners' argument that the 1875 Act established common law easements. *Id*. at 729. We stated:

> The easement granted by Congress is an easement subject to the intentions and specifications of Congress; it is not a common law easement. Congress could pre-empt or override common-law rules regarding easements, reversions, or other traditional property interests. In other words, even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement. . .

---

6.	The landowners' predecessors in title had acquired the land from the United States via land patent. *See Barney*, 490 NW2d at 727. However, this fact is not discussed in our analysis.

. The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of property law.

*Id*. (quoting State of Idaho v. Oregon Short Line R. Co. (*Idaho I*), 617 FSupp 207, 212 (DIdaho 1985)).

[¶19.]		In rejecting the landowners' argument, we examined the Congressional Record that accompanied the enactment of section 912, and concluded that "[i]t is clear from the legislative history that Congress assumed it possessed some type of reversionary or other interest in the railroad rights-of-ways." *Id*. at 730. We reasoned that section 912 and related statutes would be rendered null if we were to find them inapplicable to 1875 Act ROWs because "they were specifically enacted to dispose of the United States' retained interest in 1875 Act rights-of-way." *Id*. at 731 (quoting *Idaho I*, 617 FSupp at 212). Accordingly, we determined that the United States retained a reversionary interest in the ROW and applied section 912. *Id*.

[¶20.]		Today, taking into consideration the language of the patent, we revisit our rationale in *Barney* and our determination that the United States retained a reversionary interest in an 1875 Act railroad ROW. Under the facts of the case before us, we reach a contrary conclusion based upon the clear language of the homestead patents. By the declaration of the patent, the federal government reserved no interest in the ROW to which section 912 could apply. Any reference by Congress to reversionary interests by subsequent enactments does not change the United States' initial divestment of its interest by patent. This conclusion also conforms to the analysis of the more recent federal cases of *Beres* and *Hash*. 64 FedCl 403; 403 F3d 1308. It also more closely follows the Supreme Court decisions

in *Great N. R.R. Co.* (stating that the property right created in the railroad right-of-way was only an easement granting use and occupancy, but no fee interest) and *Leo Sheep Co.* (expressing unwillingness to interfere with land rights in which no reservations were present when conferred). 315 US at 273-74, 62 SCt at 533-34, 86 LEd 836; 440 US at 687-88, 99 SCt at 1414, 59 LEd2d 677. To the extent that this holding conflicts with *Barney*, *Barney* is overruled.

### d. Conclusion

[¶21.] We find *Beres* and *Hash* to be the more persuasive authorities. These federal cases recognize the significant role a land patent plays in establishing title to property. "A patent to land, issued by the United States under authority of law, is the highest evidence of title, something upon which the holder can rely for peace and security in his possession." Nichols v. Rysavy, 610 FSupp 1245, 1254 (DSD 1985). The United States Supreme Court has stated that "when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States." Swendig v. Washington Water Power Co., 265 US 322, 331, 44 SCt 496, 499, 68 LEd 1036 (1924) (citing U.S. v. Schurz, 102 US 378, 396, 26 LEd 167 (1880)). Our holding today recognizes the "special need for certainty and predictability where land titles are concerned. . . ." *Leo Sheep Co.*, 440 US at 687, 99 SCt at 1413, 59 LEd2d 677.

[¶22.] We need not decide what interest, if any, the United States retained pursuant to the 1875 Act. Rather, our holding today is limited to the facts of this case. Therefore, whatever interest the United States retained in the ROWs through the 1875 Act was relinquished when land patents were issued without reserving a

right in the ROWs.  While NHRAA argues that we should follow the rationale in *Barney*, we decline to do so.  Although section 912 and related legislation suggest that Congress "assumed" or "intended" to retain a reversionary interest in the ROWs, these statutes were passed after Congress passed the legislation establishing the ROWs and after the land patents were issued to Brown's predecessors.  Legislative goals change over the years; therefore, the "[r]esort to using subsequent congressional activity of any variety to interpret earlier legislation should be cautiously approached. . . ."  *Beres*, 64 FedCl at 416.  Consequently, we agree with Brown that the language of section 912 does not apply.  The determining factor in this case is the language of the patent.  The patent reserved no interest in the ROW on behalf of the United States and the circuit court erred when it applied section 912 to determine whether the ROW had been abandoned.  Accordingly, we remand to the circuit court for a determination of abandonment in conformity with this opinion.

[¶23.]     Reversed and remanded.

[¶24.]     GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.