VULCRAFT AND NUCOR COLD FINISH, DIVISIONS OF NUCOR CORPORATION, A DELAWARE CORPORATION, APPELLEES, V. M. BERRI BALKA, TAX COMMISSIONER OF THE NEBRASKA DEPARTMENT OF REVENUE, AND STATE OF NEBRASKA, APPELLANTS.

555 N.W.2d 344

Filed November 5, 1996.    No. A-95-686.

Don Stenberg, Attorney General, and L. Jay Bartel for appellants.

Tim O'Neill, of Harding & Ogborn, for appellees.

IRWIN, SIEVERS, and INBODY, Judges.

SIEVERS, Judge.

Vulcraft and Nucor Cold Finish (Vulcraft), divisions of Nucor Corporation, filed a petition for redetermination with M. Berri Balka, the Tax Commissioner of the State of Nebraska, concerning certain use taxes paid under protest on its processing oils. The Tax Commissioner dismissed the petition, and Vulcraft appealed to the Lancaster County District Court. On appeal, the district court reversed the judgment of the Tax Commissioner. The Tax Commissioner and the State of Nebraska now appeal, contending that the district court erred in concluding that Vulcraft's use of drawing, turning, and grinding oils qualified for an exemption under Nebraska's use tax. For the reasons set forth below, we affirm.

## FACTUAL BACKGROUND

Vulcraft manufactures steel bars in its Norfolk, Nebraska, plant. As part of its manufacturing process, Vulcraft utilizes processing oils. It is these processing oils that are the subject of the instant appeal.

At Vulcraft, the final steps of manufacturing a steel bar are collectively referred to as "cold finishing." The bar, in a hot

rolled state, is initially taken through a "shot blaster," which shoots "high velocity pellets" against the bar in order to remove all scale and dirt. The bar is then inserted into a die, where a carriage grabs the end of the bar and accelerates it through the die. The die, which is smaller than the bar, is similar to a funnel. The die reduces the cross section and increases the length of the bar. The bar is then cut to length, straightened, banded in quantities, and placed in storage for shipment. The purpose of this cold-finishing process is to reduce the cross section area of the bar, to give the bar a very smooth surface, and to increase the tensile and yield strength of the bar. The process is called cold finishing because no heat is added. Some examples of cold-finished bars include shock absorbers on cars and hydraulic cylinders on tractors.

Prior to the entry of the bar into the die, drawing oil is pumped onto the bar. This oil creates a barrier which protects both the die and the surface of the bar while the bar is passing through the die. The oil also acts as a rust inhibitor that prevents oxidation during further processing. The die leaves an extremely fine film of oil on the bar. The excess drawing oil is filtered, returned to the recirculation tank, and then reused. Drawing oil is subsequently added to replace that which is "consumed" by the bar as it exits the die. Approximately 80 percent of Vulcraft's bars are complete after undergoing the drawing process.

Some of Vulcraft's customers require that the bar undergo further steps to ensure that the bar is flawless or has only minimal defects. Turning is a process designed to reduce the "depth of defect" on the bar. In this process, a cutting tool removes material as it rotates around the bar. A water soluble turning oil is flooded onto the bar to create a protective barrier between the bar and the tool. The oil is also considered to be a rust inhibitor. An air knife then removes virtually all the water aspect of the solution, leaving the oil for rust prevention purposes. The runoff solution is collected, returned to recycling tanks, cooled to eliminate the water, and then reused. Again, the oil consumed is that which is left on the bar at the completion of the turning process.

A ground bar is a higher value-added, or more sophisticated, product with an extremely fine finish. In this process, the bar enters through a pair of transport disks that forces it into a set of grinding stones. A grinding oil, which is water soluble, is applied to the stone and to the bar. As the bar leaves the grinder, the stone area where the material has been removed, an air knife and wiper remove all the water, leaving a very fine film of grinding oil. The oil provides rust protection to the bar and lubrication between the grinding stone and the bar. The bar is continuously wiped, and virtually no oil remains on it. The oil is then returned to the collection tank, recirculated, and reused. The grinding oil constantly recirculates for years, and Vulcraft adds only a minute amount of oil to compensate for the oil that is used on the bars.

Before each bar is complete, Vulcraft applies a final oil called Metkote. Metkote is a long-term rust preventative that provides the bar with an estimated 2-year shelf storage life. Metkote additionally prevents the bars from wearing on each other when stacked in bundles. Metkote does not clean the bar and does not neutralize the processing oils. Furthermore, the processing oils do not evaporate, but remain on the bar that is ultimately sold and shipped to the customer. Metkote does not, however, require the presence of the processing oils in order to be effective. It is undisputed that rusting would occur if Metkote was not applied to the bar, since the processing oils act only as short-term rust inhibitors. There is, however, a dispute as to whether the processing oils add any long-term rust prevention benefits to Metkote.

The application of Metkote can occur 10 to 12 days after going through the drawing process. If the processing oils were not applied to the bars, moisture in the air would cause the fresh metal surface to rust relatively instantaneously. Two of Vulcraft's employees testified that the processing oils add value to the finished product. Additionally, Dean Orr, a metallurgical engineer and an accredited corrosion specialist, testified that rather than adding to the product, the processing oils keep the product from losing value by preventing rust during the manu-facturing process. If the processing oils were not applied to the bar, the value of the product could be affected by corrosion. The

end result would be a surface that was not acceptable to the customer. Orr also testified that the processing oils were "essential" during processing, but not as a part of the final product.

In July 1991, the Nebraska Department of Revenue issued Vulcraft a notice of deficiency determination. Based on the audit period June 1, 1988, to May 31, 1991, the department calculated that Vulcraft owed $18,633 in use tax, or $24,686 when combined with interest and penalties. Vulcraft paid the $18,633 under protest and filed a petition for redetermination. The Tax Commissioner concluded that the processing oils were not exempt from the use tax as an ingredient or component part of property manufactured, processed, or fabricated for ultimate sale at retail. The Lancaster County District Court reversed the judgment of the Tax Commissioner, concluding that the processing oils were essential ingredients or component parts of the finished steel bars.

## ASSIGNMENT OF ERROR

The Tax Commissioner and the State contend that the district court erred in holding that Vulcraft's purchase and use of drawing, turning, and grinding oils qualified for use tax exemption as ingredient or component parts of property manufactured, processed, or fabricated for ultimate sale at retail.

## STANDARD OF REVIEW

Proceedings for review of a final decision of an administrative agency shall be to the district court, which shall conduct the review without a jury de novo on the record of the agency. *Abbott v. Department of Motor Vehicles*, 246 Neb. 685, 522 N.W.2d 421 (1994); *Gausman v. Department of Motor Vehicles*, 246 Neb. 677, 522 N.W.2d 417 (1994). On an appeal under the Administrative Procedure Act, an appellate court reviews the judgment of the district court for errors appearing on the record and will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995); *Wagoner v. Central Platte Nat. Resources Dist.*, 247 Neb. 233, 526

N.W.2d 422 (1995); *Abdullah v. Nebraska Dept. of Corr. Servs.*, 245 Neb. 545, 513 N.W.2d 877 (1994). When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Wagoner, supra; Sunrise Country Manor v. Neb. Dept. of Soc. Servs.*, 246 Neb. 726, 523 N.W.2d 499 (1994); *Abbott, supra.*

As to questions of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995); *Winslow v. Hammer*, 247 Neb. 418, 527 N.W.2d 631 (1995); *In re Guardianship & Conservatorship of Bloomquist*, 246 Neb. 711, 523 N.W.2d 352 (1994). *George Rose & Sons v. Nebraska Dept. of Revenue*, 248 Neb. 92, 95, 532 N.W.2d 18, 21-22 (1995) (appeal from district court's affirmance of order by State Tax Commissioner which sustained deficiency assessments for sales and use taxes). See, also, Neb. Rev. Stat. § 84-918 (Reissue 1994).

## ANALYSIS

■ We initially set forth the applicable statutes in effect at the time Vulcraft's petition for redetermination was filed, August 2, 1991. See *Val-Pak of Omaha v. Department of Revenue*, 249 Neb. 776, 545 N.W.2d 447 (1996) (applying statutes in effect at time claim for refund was filed). Neb. Rev. Stat. § 77-2703(1) (Cum. Supp. 1994) imposes a sales tax upon the gross receipts from all sales of tangible personal property sold at retail in Nebraska, and § 77-2703(2) imposes a use tax on the storage, use, or other consumption in Nebraska of property purchased, leased, or rented from any retailer.

■ Pursuant to Neb. Rev. Stat. § 77-2702(11)(a) (Reissue 1990), now codified at Neb. Rev. Stat. § 77-2702.13(2) (Supp. 1995), retail sale or sale at retail shall not mean the sale of tangible personal property which will enter into and become an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale at

retail. Furthermore, § 77-2702(20), now codified at Neb. Rev. Stat. § 77-2702.23 (Cum. Supp. 1994), stated:

> Use . . . shall not include the sale of that tangible personal property in the regular course of business or the exercise of any right or power over tangible personal property which will enter into or become an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale at retail.

The Nebraska Supreme Court, in *Nucor Steel v. Leuenberger*, 233 Neb. 863, 448 N.W.2d 909 (1989), concluded that § 77-2702(11)(a) and (20) (Reissue 1986) provided an exemption from the Nebraska sales and use tax. A statute conferring an exemption from taxation is to be strictly construed, and one claiming an exemption from taxation of the claimant or the claimant's property must establish entitlement to the exemption. *Nucor Steel v. Leuenberger, supra.*

The ingredient or component part exemption to Nebraska's sales and use tax has been addressed in several Nebraska cases, several of which, coincidentally, involve the Nucor Corporation. The effect of these cases makes it clear that the component or ingredient part must be "essential" to the final product before the exemption is allowed.

In *American Stores Packing Co. v. Peters*, 203 Neb. 76, 277 N.W.2d 544 (1979), the Nebraska Supreme Court determined that cellulose casings used in the manufacture of skinless meat products, such as frankfurters, did not enter into or become an ingredient or component part of the meat products. The casings contained glycerine, which moved by osmosis from the casing into the meat during manufacturing. The casings were, however, eventually cut off and discarded. In concluding that the casings were subject to Nebraska's use tax, the court stated:

> In the case before us, the casing served the apparently indispensable function of a mold. In the end, the casing is discarded. It does not become an ingredient or component in any real sense, as it does not reach the ultimate consumer of the meat product. If one judges solely by the physical evidence, i.e., a sample of unused casing and a sample of used casing, the answer seems almost obvious. The casing remains after the manufacture. The principal

> function of the glycerine and moisture is to enable the casing to serve its function. The transfer of some part of the glycerine into meat which already contains glycerine appears incidental.

*Id.* at 83, 277 N.W.2d at 548.

In *Nucor Steel v. Herrington*, 212 Neb. 310, 322 N.W.2d 647 (1982), Nucor sought to exempt graphite electrodes from taxation. Graphite electrodes were used for two purposes: to conduct electricity to melt scrap metal and to supply carbon to the molten metal, if deficient. The court held:

> Where graphite electrodes are used in the manufacture of steel for the dual purpose of providing essential carbon for the steel manufacturing process and for the conduction of electricity which provides heat for the process, and where a substantial part of the graphite electrodes enters into and becomes an essential ingredient or component part of the finished steel and the remainder is consumed in the manufacturing and refining process, the use of such graphite electrodes in the manufacturing and processing of steel for ultimate sale at retail is not subject to taxation . . . .

*Id.* at 318-19, 322 N.W.2d at 651. The court reasoned that there was no justification for holding that the purpose of using a substance which was an essential and critical ingredient of the finished product was not a primary and important purpose simply because there was also another reason for using the substance which was also important.

In *Nucor Steel v. Leuenberger, supra*, Nucor sought to exempt from taxation refractories, which were insulating and protective barriers that protected furnaces and other steel manufacturing equipment from direct exposure to molten steel and its high temperatures. These refractories wore away and deteriorated as they were used. New refractory material was purchased to replace that which was dislodged during smelting or which became exhausted as an effective insulator.

Nucor claimed that because all the refractories were eventually present in slag, scale, or bag dust, the refractories were an ingredient or component part of tangible personal property manufactured for ultimate sale at retail. The court disagreed, holding:

From *American Stores Packing Co. v. Peters, supra,* and *Nucor Steel v. Herrington, supra,* the principle evolves that material which only accidentally or incidentally becomes incorporated into a finished product and which is not an essential ingredient of the finished product is subject to sales and use tax because such material is not an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale at retail.

So long as a material enters into and is an essential ingredient or component part of a product manufactured, processed, or fabricated for ultimate sale at retail, the material is excluded from the Nebraska sales and use tax, notwithstanding that the material may be used for more than one purpose in manufacturing, processing, or fabricating the product. *Nucor Steel v. Herrington, supra.*

*Nucor Steel v. Leuenberger,* 233 Neb. 863, 872, 448 N.W.2d 909, 914 (1989).

The court determined that the presence of refractory material in slag, scale, and bag dust was only incidental to Nucor's business activity. This was evidenced by the fact that Nucor selected refractories solely on the basis of performance and longevity as effective insulators for steel-manufacturing equipment and not on the basis of refractory material as an element of slag, scale, or bag dust. Thus, the court concluded that Nucor failed to establish that the refractories entered into and became essential ingredients or component parts of Nucor's slag, scale, or bag dust.

In *Nucor Steel v. Balka,* 2 Neb. App. 138, 507 N.W.2d 499 (1993), the tangible personal property at issue were mill rolls and billet guides, materials which were used in the steel-rolling process. During the process, the materials were worn away and eventually placed in a scrap pile, which Nucor used as part of its source of iron for steelmaking. The court held that tangible personal property that is purchased and used as an essential ingredient or component part in the condition in which it was originally purchased should be exempt from taxation. However, the court also stated that tangible personal property which is purchased and originally used for a different purpose than as an

essential ingredient or component part of steel manufacturing, but which is later used as an ingredient or component part of the steel only after its use for its original purpose has been exhausted, should be subject to sales and use tax. The court concluded that because the mill rolls and billet guides only became an ingredient or component part of the steel when their usefulness as mill rolls and billet guides had been exhausted, their presence was incidental to the final product. Therefore, the purchase price was not exempt from taxation.

With those decisions as background, we return to the instant case. On appeal, the Tax Commissioner and the State do not dispute that the processing oils serve as rust preventative during processing. Rather, the Tax Commissioner and the State articulate that the processing oils are not an essential ingredient or component part of the finished steel product because their benefits are consumed or expended during processing and no longer serve any particular purposes after Metkote is applied. We find the Tax Commissioner and the State's argument unconvincing.

The materials at issue here are not ingredients, but, rather, component parts of the finished steel product. The oils coat the outer surfaces of the steel bars, but do not actually become ingredients of the steel itself, like the graphite electrodes in *Nucor Steel v. Herrington*, 212 Neb. 310, 322 N.W.2d 647 (1982). These processing oils remain on the finished product and are not neutralized by the subsequent application of Metkote.

The processing oils serve two distinct and important purposes. First, they act as a lubricant, safeguarding the steel bar during processing and also the machines used to process the bars. Second, they function as a rust inhibitor, protecting the processed bar from corrosion until Metkote can be applied. It is undisputed that the processing oils are essential during the manufacturing process, as moisture in the air causes fresh metal surfaces to rust almost immediately if not sufficiently protected. The essential nature of immediate rust protection is shown by the evidence that the product will not meet the customers' specifications and needs if damaged by rust after processing. Furthermore, it is not determinative that the processing oils may no longer serve as a rust preventative once Metkote is applied.

If the oils are not applied during processing, the finished steel bar, which is manufactured for its precision, may very well contain defects and be altogether unacceptable to the customer. Thus, we can reach no other conclusion except that the oils are an essential component of the bars.

As essential component parts of the finished steel product, the processing oils are not subject to Nebraska's use tax. The judgment of the Lancaster County District Court is supported by the evidence and is neither arbitrary, capricious, nor unreasonable.

AFFIRMED.