TOM WAGONER, APPELLANT, V. CENTRAL PLATTE NATURAL RESOURCES DISTRICT, A BODY POLITIC, ET AL., APPELLEES.

526 N.W.2d 422

Filed January 20, 1995.  No. S-93-881.

Thomas A. Wagoner and John A. Wagoner for appellant.

Randall L. Goyette and Brenda S. Spilker, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellees.

HASTINGS, C.J., WHITE, CAPORALE, LANPHIER, and WRIGHT, JJ., and GRANT, J., Retired, and HOWARD, D.J., Retired.

HASTINGS, C.J.

Plaintiff, Tom Wagoner, appeals the June 18, 1993, order of the district court which affirmed the cease and desist orders of the defendant Central Platte Natural Resources District (CPNRD). The court consolidated the two petitions for review and appeal regarding cease and desist orders issued to Wagoner for failing to comply with a ground water maintenance program rule. That rule required him to submit to CPNRD samples of soil from his farmland for nitrate testing and analysis. The first order, dated July 8, 1991, related to the crop year 1991, and the order dated September 14, 1992, related to the crop year 1992 and anticipated crop year 1993.

## STANDARD OF REVIEW

The district court reviews an administrative agency's final decision without a jury de novo on the record of the agency. *Gausman v. Department of Motor Vehicles*, 246 Neb. 677, 522 N.W.2d 417 (1994). An aggrieved party may appeal any judgment rendered or final order made by the district court under the Administrative Procedure Act. An appeal under the Administrative Procedure Act shall be taken in the manner provided by law for appeals in civil cases, and the judgment rendered or final order made by the district court may be reversed, vacated, or modified for errors appearing on the record. *Lee v. Nebraska State Racing Comm.*, 245 Neb. 564, 513 N.W.2d 874 (1994); *Bell Fed. Credit Union v. Christianson*, 244 Neb. 267, 505 N.W.2d 710 (1993). An appellate court, in reviewing a judgment of the district court for errors appearing

on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Lynch v. Nebraska Dept. of Corr. Servs.*, 245 Neb. 603, 514 N.W.2d 310 (1994). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Lee v. Nebraska State Racing Comm., supra.*

A rebuttable presumption of validity attaches to the actions of administrative agencies. The burden of proof rests with the party challenging the agency's actions. *In re Application of United Tel. Co.*, 230 Neb. 747, 433 N.W.2d 502 (1988); *Haven Home, Inc. v. Department of Pub. Welfare*, 216 Neb. 731, 346 N.W.2d 225 (1984). An appellate court will accord deference to an agency's interpretation of its own regulations unless plainly erroneous or inconsistent. *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994).

Last, the constitutionality of a statute is a question of law; accordingly, an appellate court reaches a conclusion independent of the decision reached by the trial court. *Howard v. City of Lincoln*, 243 Neb. 5, 497 N.W.2d 53 (1993).

## ISSUES ON APPEAL

Wagoner asserts that the district court erred in (1) affirming CPNRD's orders when the transcript furnished by CPNRD did not include the ground water quality management plan, the testimony of a Department of Water Resources representative, and results of tests conducted by CPNRD; (2) holding that CPNRD has statutory authority to order landowners within its district to provide deep soil samples; (3) failing to hold that CPNRD's regulations violate the Equal Protection Clause and Due Process Clause of the 14th Amendment to the U.S. Constitution and Neb. Const. art. I, §§ 1 and 3; and (4) failing to hold that CPNRD's regulations amounted to a taking of property without just compensation in violation of the 5th and 14th Amendments to the U.S. Constitution.

## FACTS

Wagoner owns and operates a farm which is within the area making up the natural resources district. Wagoner's farm was in

turn within the Phase II ground water quality management area of the district. The ground water management program rule 4 for Phase II areas requires an operator in a Phase II ground water management area to conduct "[a]n annual deep soils analysis for residual nitrate/nitrogen on each field of [sic] 40 acre tract, whichever is smaller, with the analysis to be conducted by a laboratory participating in the University of Nebraska Soil Testing Program."

According to the complaints filed against Wagoner, he was an operator of agricultural land in the Phase II ground water quality management area in both 1990 and 1991 on which irrigated corn or sorghum was grown and in both of which years he failed to comply with CPNRD's regulations, which required that he furnish and have tested deep soil samples (3 feet deep) taken from his land. After notice and hearings which Wagoner attended and in which he participated, CPNRD ordered that he cease and desist the operation of any agricultural land within the district in a manner contrary to or out of compliance with the rules. The cease and desist orders were to remain in force and effect until Wagoner furnished the necessary soil samples and otherwise complied with CPNRD's rules. Wagoner had furnished water samples and made various reports as to use of fertilizer, as required by the rules. He also offered to allow CPNRD's employees to come onto his land for the purpose of taking the soil samples or agreed to furnish the samples if CPNRD would pay him the cost of sampling and testing, which amounted to about $200.

According to the record, CPNRD held public hearings in May 1987 in Buffalo, Dawson, Hall, and Merrick Counties concerning proposed rules which required, among other regulations, landowners and operators in Phase II areas to submit annual water and deep soil analyses for nitrate content. On May 28, 1987, CPNRD adopted the ground water management program and its requirement that landowners and operators in Phase II areas submit annual water and deep soil analyses for nitrate content. Newspapers in Buffalo, Dawson, Hall, and Merrick Counties published the adopted text of the ground water management program rules. On August 26, 1987, Wagoner was informed by CPNRD that the adopted rules

required him to submit water and soil analyses to the administrative body.

In 1990, CPNRD informed those not complying with soil analysis requirements of a December 31, 1990, deadline; the need to turn in samples by February 1, 1991, to avoid noncompliance; and that the rules, having existed for 3 years, would be strictly enforced and cease and desist orders would be issued.

## ANALYSIS

We deal first with Wagoner's claim that CPNRD did not have statutory authority to order landowners within the district to provide deep soil samples. Neither party deals in an exhaustive manner with this question, although it is a pivotal issue.

The Legislature can delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute. *Robotham v. State*, 241 Neb. 379, 488 N.W.2d 533 (1992). In order to be valid, a rule must be consistent with the statute under which it is promulgated. *Id*.

The Nebraska Legislature codified the State's interest in water conservation and control in the Nebraska Ground Water Management and Protection Act, Neb. Rev. Stat. §§ 46–656 to 46–674.20 (Reissue 1988). Section 46–656 provides:

The Legislature finds that ground water is one of the most valuable natural resources in the state and that an adequate supply of ground water is essential to the general welfare of the citizens of this state and to the present and future development of agriculture in the state. The Legislature recognizes its duty to define broad policy goals concerning the utilization and management of ground water and to ensure local implementation of those goals. . . .

The Legislature further recognizes and declares that the management, protection, and conservation of ground water and the beneficial use thereof are essential to the economic prosperity and future well–being of the state and that the public interest demands procedures for the implementation of management practices to conserve and protect ground water supplies and to prevent the *contamination* or

inefficient or improper use thereof. . . .

Nothing in the Nebraska Ground Water Management and Protection Act relating to the contamination of ground water is intended to limit the powers of the Department of Environmental Contol provided in Chapter 81, article 15.
(Emphasis supplied.)

Section 46–658 of the act provides in part:

(1) An area may be designated a control area by the director following a hearing initiated in accordance with subsection (3) of this section if it shall be determined, following evaluation of relevant hydrologic and water quality data, history of developments, and projection of effects of current and new development, that development and utilization of the ground water supply has caused or is likely to cause within the reasonably foreseeable future the existence of either of the following conditions:

(a) An inadequate ground water supply to meet present or reasonably foreseeable needs for beneficial use of such water supply; or

(b) Dewatering of an aquifer, resulting in a deterioration of the quality of such ground water sufficient to make such ground water unsuitable for the present purposes for which it is being utilized.

Section 46–663 provides:

[I]n order to administer and enforce the Nebraska Ground Water Management and Protection Act and to effectuate the policy of the state to conserve ground water resources, a district may:

(1) Adopt and promulgate rules and regulations necessary to discharge the administrative duties assigned in the act;

(2) Require such reports from ground water users as may be necessary;

. . . .

(4) Report to and consult with the Department of Environmental Control on all matters concerning the entry of contamination or contaminating materials into ground water supplies; and

(5) Issue cease and desist orders, following ten days'

notice to the person affected . . . to initiate suits to enforce the provisions of orders issued pursuant to the act, and to restrain the construction of illegal wells or the withdrawal or use of water from such wells.

Section 46-673.01 provides:

Prior to January 1, 1986, each district shall prepare a ground water management plan based upon the best available information . . . .

The plan shall include, but not be limited to, the identification to the extent possible of:

. . . .

(7) Past, present, and potential ground water use within the area;

(8) Ground water quality concerns within the area.

Section 46-673.09 provides:

A district may manage the use of water in a management area by any of the following means:

(1) Allocating the total permissible withdrawal of ground water;

(2) Rotation of use of ground water;

(3) Well-spacing requirements pursuant to section 46-673.12. A district may also require the use of flow meters on wells;

(4) Best management practices; or

(5) Educational programs designed to protect water quality.

Effective September 6, 1991, § 46-673.09 was amended to add the following subsections: "(6) Requiring the analysis of water or deep soils for fertilizer and chemical content; or (7) Educational programs designed to protect water quality."

Wagoner argues that because the Legislature in 1991 added the above provisions, this demonstrates that it recognized that it had not given the authority to require that deep soil samples be provided to CPNRD. A statute may have a specific meaning which is not necessarily changed because of the Legislature's attempt by amendment to clarify that meaning. As stated in *May Broadcasting Co. v. Boehm*, 241 Neb. 660, 665, 490 N.W.2d 203, 206 (1992), "The changes in the statute did not materially affect the meaning of the statute for the purposes of these cases.

Each amendment was an effort to clarify the meaning of the statute, but the essential thrust of [the statute] has not changed." However,

> this jurisdiction is committed to the doctrine that, in a case where the proper interpretation of the statutory terms is involved, in order to ascertain the proper meaning of a statute, later as well as earlier legislation upon the same subject may be referred to. All existing acts should be considered, and a subsequent statute may often aid in the interpretation of a prior one.

*Ancient and Accepted Scottish Rite v. Board of County Commissioners*, 122 Neb. 586, 598, 241 N.W. 93, 97 (1932).

Wagoner also argues that the 1991 amendment did nothing to change the status of CPNRD's rules because the particular rule was not repromulgated by CPNRD. He is correct. In order to ratify a rule promulgated by an administrative agency for future application, it is necessary that the Legislature express an intent to do so, either by specifically appropriating funds, when necessary, to implement the rule or by making specific reference to the administrative rule in subsequently passed legislation. See *Muller Optical Co. v. E.E.O.C.*, 574 F. Supp. 946, 953 (W.D. Tennessee 1983), citing *Isbrandtsen–Moller Co. v. U.S.*, 300 U.S. 139, 57 S. Ct. 407, 81 L. Ed. 562 (1937): "Such Congressional ratification may occur when both Houses of Congress either pass legislation appropriating funds to implement the executive order or make reference to the executive order in subsequently passed legislation." Therefore, we must look to the legislation which was in effect before the 1991 amendment to determine whether CPNRD possessed authority to require deep soil sample analysis.

A natural resources district, as a political subdivision, has only that power delegated to it by the Legislature, and a grant of power to a political subdivision is strictly construed. *In Re Applications A–15145, A–15146, A–15147, and A–15148*, 230 Neb. 580, 433 N.W.2d 161 (1988) (power to acquire and dispose of water rights did not grant power to a natural resources district to transfer from one entity to another an application pending before it for water diversion).

A natural resources district possesses and can exercise the

following powers and no others: first, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; and third, those essential to the declared objects and purposes of the district—not simply convenient, but indispensable. See *Professional Firefighters of Omaha v. City of Omaha*, 243 Neb. 166, 498 N.W.2d 325 (1993).

Until the 1991 amendment to § 46-673.09, which specifically authorized the requiring of deep soil samples, the Nebraska Water Management and Protection Act seemed primarily, if not exclusively, concerned with the quantity of available water supplies. Section 46-673.09 spoke in terms of authorizing the district to allocate the total permissible withdrawal of ground water, the rotation of ground water, well spacing, flow meters, best management practices, and educational programs to protect water quality. However, beginning with Neb. Rev. Stat. § 46-674.02 (Reissue 1988), which is still a part of the act and which neither party cited or discussed, the Legislature seemed to change gears. That section provides:

The Legislature finds that:

(1) The levels of nitrate nitrogen and other contaminants in ground water in certain areas of the state are increasing;

(2) Long-term solutions should be implemented and efforts should be made to prevent the levels of ground water contaminants from becoming too high and to reduce high levels sufficiently to eliminate health hazards;

(3) Agriculture has been very productive and should continue to be an important industry to the State of Nebraska;

(4) Natural resources districts have the legal authority to regulate certain activities and, as local entities, are the preferred regulators of activities which may contribute to ground water contamination in both urban and rural areas;

(5) The Department of Environmental Control should be given authority to regulate sources of contamination when necessary to prevent serious deterioration of ground water quality;

(6) The powers given to districts and the Department of

Environmental Control should be used to stabilize, reduce, and prevent the increase or spread of ground water contamination; and

(7) There is a need to provide for the orderly management of ground water quality in areas where available data, evidence, and other information indicate that present or potential ground water conditions require the designation of such areas as special ground water quality protection areas.

The act continues, in § 46–674.03: "Each state agency and political subdivision shall promptly report to the Department of Environmental Control any information which indicates that contamination is occurring." Section 46–674.04 provides:

If, as a result of information provided pursuant to section 46–674.03 or studies conducted by or otherwise available to the Department of Environmental Control and following preliminary investigation, the Director of Environmental Control has reason to believe that contamination of ground water is occurring or likely to occur in an area of the state in the reasonably foreseeable future, the department shall, in cooperation with any appropriate state agency and district, conduct a study to determine the source or sources of the contamination and the area affected by such contamination and shall issue a written report within one year of the initiation of the study. The department shall consider the relevant water quality portions of the management plan developed by the district pursuant to section 46–673.01 during the study required in this section.

The plan referred to, made pursuant to § 46–673.01, was to include "[g]round water quality concerns within the area."

Until the 1991 amendment, it is apparent that the Legislature did not expressly grant to CPNRD the power to require landowners to furnish deep soil samples and analysis. Furthermore, it would be stretching our powers of analogy to declare that such authority was necessarily implied in or incident to any express powers, or was indispensibly essential to the declared objects and purposes of CPNRD. See *Professional Firefighters of Omaha v. City of Omaha*, 243 Neb. 166, 498

N.W.2d 325 (1993).

It is unnecessary for us to consider the other assigned errors. The judgment of the district court must be reversed and the cause remanded with directions to order the cease and desist orders previously entered by CPNRD to be vacated and the proceedings dismissed.

REVERSED AND REMANDED WITH DIRECTIONS.