ROGER E. HARDERS, APPELLEE, V. MARILYN J. ODVODY AND MILTON E. ODVODY, WIFE AND HUSBAND, APPELLANTS.

626 N.W. 2d 568

Filed June 1, 2001.   No. S-00-136.

James L. Haszard, of McHenry, Haszard, Hansen & Roth, for appellants.

Curtis A. Bromm, of Edstrom, Bromm, Lindahl, Sohl & Freeman-Caddy, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Appellee, Roger E. Harders, brought an action for an injunction against appellants, Marilyn J. Odvody (Marilyn) and Milton E. Odvody (Milton), to prevent the Odvodys from using a lane or road on his land for access to the Odvodys' farm ground. The

Odvodys filed a counterclaim seeking an injunction against Harders' interfering with their use of the road to access their field. The trial court determined that Harders was entitled to an injunction preventing the Odvodys from using the road and dismissed the Odvodys' counterclaim. The Odvodys appealed. We took this case under our power to regulate the caseloads of this court and the Nebraska Court of Appeals.

## BACKGROUND

Harders bought a parcel of pasture land from James E. Bauer and Lorraine M. Bauer in 1988. At this time, Harders was also deeded a 66-foot-wide strip of land that included a road entering the property from the south. Allegedly contained in this 66-foot strip was a 25-foot-wide easement to the "Morse Bluff Dike and Drainage District No. 1" for ingress and egress to the dike. The easement lies in the west 25 feet of the 66-foot strip.

In 1990, Harders purchased another parcel of land from the Bauers located directly to the east of the 66-foot-wide strip. Harders later sold this second parcel of land to Michael A. Brecka in 1995. In this sale, Harders included 33 feet of the 66-foot-wide strip. Harders included this strip of land in the sale so that Brecka could put his own entrance onto that property. The remaining 33 feet, which contained the 25-foot-wide road and the dike and drainage district easement, was retained by Harders.

When Brecka decided to sell this property, Harders and Brecka made a verbal agreement that Brecka would inform any new owners that they were not to use Harders' road and would provide a culvert allowance to the new owners of the property. In exchange, Brecka would pay Harders $1 at the auction where Brecka planned to sell the property to allow the new owners to have temporary access to the road on Harders' property. The reasoning was that it was late in the year and that the new owners would not have time to put in their own lane. At the auction, an announcement was made that Harders would lease access to his road for 1 year for $1 or until a new access road was built. However, the property did not sell at the auction.

Marilyn, who was employed with the real estate agency that was doing the auction and was present at the auction when the announcement was made, and Milton bought the property in a

private sale. The Odvodys bought the property for approximately $86,500, which included a $360 "Credit from Seller for Culvert." However, Marilyn stated that the culvert allowance was used to lower the price of the land.

The Odvodys did not build a new lane. Marilyn did not believe she was bound to use the lane for only 1 year because everyone in the community used the lane and she had been using it for 12 or 13 years. Marilyn testified that she and Milton travel the road to go back to the drainage dike to pick mushrooms in the spring and berries in the fall. She never asked for anyone's permission to use the lane. Since 1997, she and Milton have been up and down the road an average of 12 times a year, and prior to 1997, it was maybe 4 or 5 times a year.

Marilyn also testified that she had seen others using the road but did not ask them if they had permission. She believes that the 33 feet is "public access" that has been used since the 1930's. Marilyn also testified that she had performed maintenance on the road by filling in potholes and mowing the grass between the road and their property. Marilyn believes there is no other access to their property.

Milton testified that he has used the road for recreational purposes since 1960 and used the road probably six times a year. He never asked anybody for permission, nor was he told by anyone that you needed permission to use the lane. Milton testified that he believed he could use the road because it was used as a public place to go down to the dike for fishing. He said the lane was used that way by all of his friends. Milton also testified that he believed that the dike and drainage district's easement allowed him to use the lane. He stated that he shredded the weeds, dragged the lane, and backfilled potholes about twice a year on the lane.

Milton further testified that they decided not to build an entrance onto the county road from their land because of safety factors concerning visibility and his belief that the road which is the subject of this action was public. He also testified that he "would have to go and get the permits and go through all that" and that a new road on his land would require the use of what is now tillable farm ground.

After the first year that the Odvodys owned their parcel of land, Harders put up a fence and a gate to prevent access to the

lane. Harders testified that he telephoned William "Bud" Vopalensky and Charlie Vopalensky, who own land directly to the north of the Odvody land, and their attorney, and gave all of them the combination to the lock. Harders then testified that once the Odvodys got the combination from the Vopalenskys, Harders changed the lock to a key lock and gave Charlie Vopalensky a key and extra keys for Bud Vopalensky and his tenant farmer. However, Marilyn testified that Harders supplied the combination to their attorney to access their property. Harders stated that the gates were later torn off. Harders testified the public does not use the road without his permission. Harders also testified that he and Charlie Vopalensky have an agreement whereby if Harders does give permission for people to be on his land, Harders will tear out a deposit slip from his checkbook and give written permission. This permission includes the dates to be on his land and includes use of the road.

Harders maintains that he has only experienced two times where private citizens have been traveling the lane as a public road. Harders testified that in the first instance, he told the person that it was a private lane and he never saw that person again. In the second instance, Harders testified that he could not find the person so he had the person's car towed. Harders lives 24 to 26 miles from this piece of property, however, he averages driving by it two to four times per week during the summer and winter.

Testimony was given from several witnesses concerning people using the road either to access land or for recreational purposes. There was also testimony concerning whether these people may have had either an easement or permission to use the lane. Harders testified that Bud Vopalensky and the dike and drainage district have written easements recorded at the register of deeds.

Larry Dolezal, who owns property to the east of the road, has used this road at times to access his land. Dolezal is 51 years old and testified he has used the road for at least 20 years. Dolezal also testified that he has used the road every year for recreational purposes from the time he was 10 or 15 years old. He stated that he never obtained permission from anyone to use the road and was never told by anyone that he could not use the road or that he needed permission to use the road. Dolezal believed the road was public.

Dolezal also testified that he saw other people using the road for recreational purposes, although he could not say when. However, he said it was possible that those people may have had permission to use the lane. When asked if it was a common occurrence to see people using the lane when he used it, Dolezal responded, "I don't know how common you'd call it . . . ." Dolezal was asked on cross-examination how often he saw people that he did not recognize using the lane within the last 15 years. He responded, "I'd say probably a couple times a year. But I'm not there all the time either. It's just maybe some years none and others [sic] years there would be somebody. It's hard to say. I couldn't answer that to be real accurate."

On cross-examination, it was discovered that Dolezal was a friend of the prior owners, the Bauers. Dolezal's initial use of the lane started when he was hunting and fishing with the Bauers' children. Harders stated in his brief that Dolezal had permission from the Bauers to use the lane. The Odvodys maintained that Harders misstated Dolezal's testimony. Dolezal was asked, "Would it be fair to say that your initial use of the lane started when you were hunting and fishing with the Bauer children?" He replied, "Probably that's when I first started."

Bud Vopalensky testified that he needs to use the lane to access his property. Bud Vopalensky is 74 years old and testified that his land has been in the family since 1917. He also testified that he used the lane for hunting and fishing at least once a year and "[p]robably three or four times a day . . . ." He stated that he never asked anyone's permission and had never been told by anyone that he needed permission to use the lane. Bud Vopalensky said he also saw other people use the lane for access to the dike area but he did not know whether they had permission because "nobody even thought of asking permission cause they, everybody was each other's friend."

Bud Vopalensky said that he also performed some maintenance to the road by dragging it and filling in the potholes. He testified that he has an easement across the dike and drainage district property. However, Bud Vopalensky gave conflicting testimony on cross-examination about whether he has an easement to use the 25-foot-wide road. First, he stated that he did not have a written easement of the lane. Later in the cross-examination,

he stated that he did have an easement in the property described as the lane.

William Lindholm, the director of public works for Saunders County, testified that a permit was needed to obtain access off a public road in Saunders County. Lindholm specifically looked at the Odvodys' property line along the county road. He testified that he did not see any reason to deny an application for an entrance to this property if one were requested from his department. He did say that an engineering study would first have to be performed.

## ASSIGNMENTS OF ERROR

The Odvodys assign, restated, that the court erred (1) in granting an injunction to Harders as the decision was contrary to law and not supported by the facts, (2) in dismissing the counterclaim of the Odvodys because the decision was contrary to law and not supported by the facts, (3) in not finding an easement in favor of the Odvodys over the lane belonging to Harders, (4) in granting an injunction to Harders without evidence of irreparable harm, and (5) in granting an injunction to Harders when he had an adequate remedy at law.

## STANDARD OF REVIEW

An action for injunction sounds in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Village of Winslow v. Sheets, ante* p. 203, 622 N.W.2d 595 (2001).

## ANALYSIS

The Odvodys make four arguments asserting they have a right to use the lane located on Harders' property. The Odvodys argue that a prescriptive easement was gained through public use. They argue the dike and drainage district easement constitutes an easement for public use. The Odvodys further maintain that an injunction should not be issued because Harders has an ade-

quate remedy at law and has not suffered irreparable harm. The Odvodys also argued in their brief that the easement was by necessity, but have abandoned this argument.

NO PRESCRIPTIVE EASEMENT THROUGH PUBLIC USE

To establish a road or highway by prescription, there must be a use by the general public, under a claim of right adverse to the owner of the land, of some particular or defined line of travel, and the use must be uninterrupted and without substantial change for 10 years, the period of time necessary to bar an action to recover the land. *Sturm v. Mau*, 209 Neb. 865, 312 N.W.2d 272 (1981).

The general rules applicable to prescriptive easements are as follows:

"The use and enjoyment which will give title by prescription to an easement is substantially the same in quality and characteristics as the adverse possession which will give title to real estate. It must be adverse, under a claim of right, continuous and uninterrupted, open and notorious, exclusive, with the knowledge and acquiescence of the owner of the servient tenement, for the full prescriptive period."

*Svoboda v. Johnson*, 204 Neb. 57, 62, 281 N.W.2d 892, 897 (1979).

The prevailing rule is that where a claimant has shown open, visible, continuous, and unmolested use of land for a period of time sufficient to acquire an easement by adverse user, the use will be presumed to be under claim of right. *Svoboda v. Johnson, supra*. If a person proves uninterrupted and open use for the necessary period without evidence to explain how the use began, the presumption is raised that the use is adverse and under claim of right, and the burden is on the owner of the land to show that the use was by license, agreement, or permission. The presumption of adverse use and claim of right, when applicable, prevails unless it is overcome by a preponderance of the evidence. *Id.*

To prove a prescriptive right to an easement, all the elements of prescriptive use must be generally established by clear, convincing, and satisfactory evidence. *Id.* The trial court made

specific fact findings in its journal entry dated January 11, 2000. In holding that a prescriptive easement by public use was not established, the trial court stated:

> The evidence reveals that the Access Way is simply a farm lane. It is not a well-traveled or well-defined roadway. The evidence shows that the persons using it are either using it with permission or out of necessity. The [Odvodys] adduced evidence that the Access Way had been used in the past by persons seeking access to the dike for pleasure purposes: hunting, picnicking, etc. While this use may well have occurred, it does not amount to clear and convincing proof of the requisite elements.

Under our standard of review, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Village of Winslow v. Sheets, ante* p. 203, 622 N.W.2d 595 (2001). The trial court's fact findings and ruling determining that a prescriptive easement by public use was not established are supported by the record before this court. The remaining reports of occasional traffic across the lane are insufficient under the clear and convincing standard to establish a prescriptive easement by public use. From our de novo review, we conclude that a prescriptive easement by public use was not created over the 25-foot-wide lane or road contained on Harders' property.

### Irreparable Harm

An injunction is an extraordinary remedy and ordinarily should not be granted except in a clear case where there is actual and substantial injury. Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999); *State v. World Diversified, Inc.*, 254 Neb. 307, 576 N.W.2d 198 (1998).

In the present case, Harders alleges that the Odvodys have continued to access his land even after a fence with a gate was constructed. Harders alleges that he will suffer irreparable harm by the Odvodys' continuing to pass through his real estate. The

Odvodys argue there was no evidence adduced that any harm came to the road as a result of their use. Therefore, the Odvodys conclude that Harders has not suffered any harm and could be compensated in an action at law if any damages were established.

■ This court stated in *Sillasen v. Winterer*, 76 Neb. 52, 54, 107 N.W. 124, 125 (1906), that "the rule is firmly established in this state and elsewhere that, where the nature and frequency of trespasses are such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land, an injunction will be granted." We also stated in *Thomas v. Weller*, 204 Neb. 298, 304, 281 N.W.2d 790, 793 (1979), that "[c]oncerning simple acts of trespass, equity has, in most cases, no jurisdiction, but if the nature and frequency of trespasses are such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land, an injunction will be granted."

Therefore, we conclude the Odvodys' repeated trespasses on Harders' property would be a proper case for an injunction to be used to prevent continued trespasses by the Odvodys.

### DIKE AND DRAINAGE DISTRICT EASEMENT

■ The Odvodys argue that the dike and drainage district easement constitutes a public easement thereby allowing them the use of the lane. The extent of an easement created by such a conveyance is fixed by the conveyance, and the meaning thereof is to be found in its language construed in the light of relevant circumstances. *Bors v. McGowan*, 159 Neb. 790, 68 N.W.2d 596 (1955).

■ The trial court made a finding that nothing in the language of the easement allowed for a public road. However, in this case, the actual dike and drainage district easement is not contained in the record before this court. It is incumbent on the party appealing to present a record which supports the errors assigned, and absent such a record, the decision of the lower court will be affirmed. *Durkan v. Vaughan*, 259 Neb. 288, 609 N.W.2d 358 (2000).

### EASEMENT BY NECESSITY

The Odvodys conceded their easement by necessity argument at oral argument before this court. As such, we refrain from analyzing this assignment of error any further.

## CONCLUSION

We affirm the trial court's decision denying the Odvodys' request for an injunction and dismissing their counterclaim. We also affirm the trial court's determination that the Odvodys be enjoined from interfering with the property of Harders and that they be expressly enjoined from trespassing thereon.

AFFIRMED.