WHIPPS LAND & CATTLE COMPANY, INC., A NEBRASKA
CORPORATION, AND LYNDELL W. WHIPPS AND
DORIS WHIPPS, HUSBAND AND WIFE, APPELLANTS, V.
LEVEL 3 COMMUNICATIONS, LLC, A DELAWARE
LIMITED LIABILITY COMPANY, APPELLEE.

658 N.W.2d 258

Filed March 14, 2003. No. S-01-1206.

Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellants.

Danene J. Tushar and Daniel J. Guinan, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HENDRY, C.J., WRIGHT, GERRARD, and MILLER-LERMAN, JJ., and IRWIN, Chief Judge.

GERRARD, J.

## NATURE OF CASE

Whipps Land & Cattle Company, Inc., and Lyndell W. Whipps and Doris Whipps (collectively Whipps) sued Level 3 Communications, LLC (Level 3), after Level 3 installed underground fiber-optic cable in railroad rights-of-way that abut

Whipps' properties in Hitchcock and Dundy Counties. The primary issue presented in this appeal is whether the district court correctly concluded that Whipps had no interest in the Hitchcock County right-of-way.

## FACTUAL BACKGROUND

Although all of the issues presented in this case stem from Level 3's installation of underground fiber-optic cable, the issues differ significantly with respect to the Hitchcock County and Dundy County properties, because of the chain of title of the properties and the railroad rights-of-way.

In 1882, the federal government, pursuant to the General Railroad Right of Way Act of 1875, granted the Republican Valley Railroad Company a right-of-way over the Hitchcock County property, which then still belonged to the federal government. The Hitchcock County property was subsequently granted by patent deed to Alpheus Talkington. The property was eventually conveyed to Frank and Vera Whipps, who in turn conveyed the property by warranty deed to the Whipps Land & Cattle Company, Inc., in 1975. The right-of-way is now held by the Republican Valley Railroad Company's successor, the Burlington Northern and Santa Fe Railway Company (BNSF). The Hitchcock County right-of-way is 200 feet wide.

The Dundy County right-of-way was granted by deed to the Republican Valley Railroad Company in 1881 by Charles Hickman, Whipps' predecessor in title to the Dundy County property. This right-of-way is also now held by BNSF. The right-of-way deed created a right-of-way that is 100 feet wide.

Level 3 entered into an agreement with BNSF granting Level 3 right-of-way access to construct a fiber-optic network along BNSF's rights-of-way. Level 3 installed underground fiber-optic cable within the Hitchcock County right-of-way in 1999. The cable installation occurred on the northern side of the right-of-way, about 90 feet from the railroad tracks, which generally follow the centerline.

Due to an error in Level 3's construction plans, the installation of the cable continued to be 90 feet from the centerline in Dundy County—placing the cable approximately 40 feet outside the right-of-way and on Whipps' Dundy County property. When the

discrepancy was discovered, construction was halted and the 2,000 feet of installed cable on the Dundy County property was abandoned. Level 3 completed its construction by rerouting cable installation inside the right-of-way.

Whipps sued for trespass, intentional invasion of privacy, and unconstitutional taking. Whipps sought damages, injunctive relief, and attorney fees pursuant to 42 U.S.C. §§ 1983 (2000) and 1988 (Supp. IV 1998). The district court granted partial summary judgment against Whipps with respect to activities inside the railroad rights-of-way in both Hitchcock and Dundy Counties, concluding that BNSF's rights-of-way were sufficient for BNSF to permit Level 3's cable installation. The district court concluded that BNSF held all title to the Dundy County right-of-way and that Whipps had no interest in the property subject to the Hitchcock County right-of-way.

The matter proceeded to trial regarding Level 3's admitted incursion 40 feet outside the Dundy County right-of-way. The district court rejected Whipps' constitutional claim, finding that Level 3's actions were not a taking, did not involve state action, and were unintentional. The district court found that Level 3's actions were not an intentional invasion of privacy, but simply a trespass. The district court awarded damages for trespass on the Dundy County property in the amount of $3,500. No injunctive relief was granted.

## ASSIGNMENTS OF ERROR

Whipps assigns, restated and consolidated, that the district court erred in (1) granting partial summary judgment with respect to Whipps' claims regarding Level 3's installation of cable inside the Hitchcock County right-of-way, (2) refusing to award damages for the unconstitutional taking of the Dundy County property, (3) failing to award attorney fees under §§ 1983 and 1988, (4) failing to find and award damages for an intentional invasion of privacy, and (5) refusing to grant injunctive relief to prevent future trespasses by Level 3.

It should be noted that Whipps does not make any appellate argument with respect to Level 3's installation of cable inside the Dundy County right-of-way. Thus, the issues are generally confined to (1) Whipps' interest, if any, to property *inside* the

Hitchcock County right-of-way and (2) Whipps' claims and damages resulting from Level 3's incursion *outside* the Dundy County right-of-way.

## STANDARD OF REVIEW

■ In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Egan v. Stoler, ante* p. 1, 653 N.W.2d 855 (2002).

■ Statutory interpretation presents a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id.*

■ In a federal civil rights action, whether the plaintiff has shown state action is a mixed question of law and fact that is reviewed de novo by an appellate court. See, *Puerto Rico Tele. v. Telecommunications Reg. Bd.*, 189 F.3d 1 (1st Cir. 1999); *Duke v. Smith*, 13 F.3d 388 (11th Cir. 1994); *Merritt v. Mackey*, 932 F.2d 1317 (9th Cir. 1991). In a de novo review, an appellate court reaches a conclusion independent of the trial court. *Tipp-It, Inc. v. Conboy*, 257 Neb. 219, 596 N.W.2d 304 (1999).

■ An action for injunction sounds in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court. See *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002).

## ANALYSIS

### HITCHCOCK COUNTY RIGHT-OF-WAY

We first address Whipps' claims regarding the property inside the Hitchcock County right-of-way. We begin this analysis on the most fundamental level: What, if any, interest does Whipps have in the property inside the right-of-way? Answering this question requires two separate determinations. We must first determine the scope of the railroad right-of-way—what it included and what interest remained in the grantor, the United States. Second, we must determine whether any interest that remained in the United States still remains with the United States or if that interest was

subsequently transferred by the United States to Whipps' predecessor in title.

The scope of BNSF's right-of-way is a matter of federal law. It is important to understand, at the outset, that while the vocabulary of the common law of real property is often imported into the discussion of railroad rights-of-way, where those rights-of-way have been created by federal law, they are entirely creatures of federal statute, and their scope and duration are determined, not by common-law principles, but by the relevant statutory provisions. See, *Brown v. State*, 130 Wash. 2d 430, 924 P.2d 908 (1996); *Puett v. Western Pacific Railroad*, 104 Nev. 17, 752 P.2d 213 (1988).

The Hitchcock County right-of-way was created by virtue of the General Railroad Right of Way Act of 1875 (hereinafter 1875 Act), 43 U.S.C. § 934 et seq. (2000). In *State of Idaho v. Oregon Short Line R. Co.*, 617 F. Supp. 207 (D. Idaho 1985), the court discussed the history of the 1875 Act.

> From 1850 to 1871, Congress subsidized railroad construction through large grants of public lands. *Great Northern Railroad Co. v. United States*, 315 U.S. 262, 263, 62 S.Ct. 529, 533, 86 L.Ed. 836 (1942). In 1871, Congress, with a finger to the prevailing winds of public opinion, changed this policy and discontinued outright grants of land to railroads. *Id.* Congress, however, still intended railroads to have exclusive use and possession of railroad rights-of-way. This may be inferred from the continued use of the term "right-of-way" in the 1875 Act and from the fact that railroads must have exclusive use of their rights-of-way in order to function. The term "right-of-way," in the context of railroad property interests, is a term of art signifying an interest in land which entitles the railroad to the exclusive use and occupancy in such land. . . . Because exclusive use and occupancy are not rights comprised within the traditional definition of an easement, definitional problems later arose in describing the nature of the railroad's interest in its right-of-way.

*Oregon Short Line R. Co.*, 617 F. Supp. at 210.

From 1871 to 1875, Congress dealt with railroad rights-of-way on an individualized basis. *Id.* Congress then passed the 1875 Act, which provided, in relevant part, that "[t]he right of way through

the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory . . . to the extent of one hundred feet on each side of the central line of said road." See § 934. The operative language of the 1875 Act was virtually identical to that of most or all of the pre-1871 acts. *Oregon Short Line R. Co., supra.*

It is clear that the 1875 Act was not intended to grant a fee interest to railroads. *Oregon Short Line R. Co., supra.* The nature of the interest conveyed, however, was subject to some confusion. The result of early U.S. Supreme Court decisions was a concept of " 'limited fee with an implied condition of reverter.' " *Oregon Short Line R. Co.*, 617 F. Supp. at 210, citing *Northern Pacific Ry. v. Townsend*, 190 U.S. 267, 23 S. Ct. 671, 47 L. Ed. 1044 (1903). The concept of a "limited fee" was probably applied because under the common law of real property, an easement was an incorporeal hereditament which did not give an exclusive right of possession. See *State of Wyoming v. Udall*, 379 F.2d 635 (10th Cir. 1967). As the meaning of the term "easement" expanded, in the context of railroads, to include the right in perpetuity to exclusive use and possession of the land, the "limited fee" concept disappeared. See *id.* By 1942, the U.S. Supreme Court modified its understanding of rights-of-way under the 1875 Act and held that the rights-of-way were only easements and not fee interests. See *Great Northern Ry. Co. v. U. S.*, 315 U.S. 262, 62 S. Ct. 529, 86 L. Ed. 836 (1942).

Given the foregoing, the *Oregon Short Line R. Co.* court reached the following conclusions:

> Congress, in granting the 1875 Act rights-of-way, did not intend to convey to the railroads a fee interest in the underlying lands. Congress did, however, intend to give the railroads an interest suitable for railroad purposes—a right-of-way, which, by definition, carried with it the right to exclusive use and occupancy of the land.

617 F. Supp. at 212. See, also, *Simacek v. York County Rural P.P. Dist.*, 220 Neb. 484, 370 N.W.2d 709 (1985). Applied to the instant case, we similarly conclude that BNSF's right-of-way, when created, was an easement as explained above, with a reversionary interest in the United States should the right-of-way cease to be used for railroad purposes.

Having concluded that the United States retained an interest in the property subject to the right-of-way, we must now determine what happened to that interest when the United States conveyed the Hitchcock County property to Whipps' predecessors in title. Courts are divided on that question. However, the prevailing view is that the underlying interest in active rights-of-way is held by the United States, and not by the adjacent landowner.

Pertinent to this determination is the specific provision made by the U.S. Congress for abandoned railroad rights-of-way. In 1922, Congress enacted 43 U.S.C. § 912 (2000), which provides in relevant part that when a railroad right-of-way is abandoned, "all right, title, interest, and estate of the United States in said lands shall . . . be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted."

Excepted, however, are any lands on which a public highway is established within 1 year of the abandonment of the right-of-way and the mineral rights in the land, which are reserved in the United States. See *id.* Furthermore, if the right-of-way runs through a municipality, the municipality acquires the federal interest, regardless of whether it has title to the adjacent fee. See, *id.*; *Buckley v. Burlington Northern*, 106 Wash. 2d 581, 723 P.2d 434 (1986).

Of the few courts to have directly considered disposition of reversionary interests created under the 1875 Act, most have determined that § 912 applies to rights-of-way created pursuant to the 1875 Act. See, *Marshall v. Chicago and Northwestern Transp. Co.*, 31 F.3d 1028 (10th Cir. 1994); *Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330 (9th Cir. 1990); *State of Idaho v. Oregon Short Line R. Co.*, 617 F. Supp. 207 (D. Idaho 1985); *Barney v. Burlington Northern R. Co.*, 490 N.W.2d 726 (S.D. 1992). But see *City of Aberdeen v. Chicago & North Transp.*, 602 F. Supp. 589 (D.S.D. 1984).

> "This Court has the obligation to interpret § 912 . . . in such a way to fully effectuate congressional intent: These statutes would be rendered null if this Court were to find them inapplicable to 1875 Act rights-of-way, for they were specifically enacted to dispose of the United States' retained

interest in 1875 Act rights-of-way. *See* [H.R. Rep. No. 217, 67th Cong., 1st Sess. 1 (1921); H.R. Rep. No. 843, 66th Cong., 2d Sess. 2 (1920)]. In enacting these statutes, Congress clearly felt that it had some retained interest in railroad rights-of-way. The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law. . . . [C]ongressional committeemen in the early 1920's spoke of this retained interest in terms of an 'implied condition of reverter.' Regardless of the precise nature of this interest, Congress clearly believed that it had authority over 1875 Act railroad rights-of-way. [Section 912] evince[s] an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation. . . .

In conclusion, the Court finds that [§ 912] appl[ies] to 1875 Act rights-of-way."

*Marshall*, 31 F.3d at 1032, quoting *Oregon Short Line R. Co.*, *supra*. Accord *Barney, supra*.

Even if the 1875 Act granted only an easement, as opposed to a higher right-of-way interest, Congress had authority, by virtue of its broad power over interstate commerce, to grant such easements subject to its own terms and conditions—which were to preserve a corridor of public transportation, particularly the railroad transportation, in order to facilitate the development of the "Western vastness." Congress could pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests. In other words, even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement. This is consistent with another well-settled rule of statutory construction which provides that conveyances by the Government will be strictly interpreted against the grantee and in favor of the grantor.

*Oregon Short Line R. Co.*, 617 F. Supp. at 212.

Simply put, the above-cited courts have concluded that if the United States' retained interest in a railroad right-of-way was

conveyed to the United States' successor in title along with the adjacent fee, then Congress would not have needed to enact § 912 to transfer that interest upon abandonment of the right-of-way. Furthermore, § 912 could not, as it purports, transfer that interest to anyone other than the adjacent feeholder, such as states or municipalities, nor could the United States reserve the mineral estate to itself.

A court may, in order to ascertain the proper meaning of a statute, refer to later as well as earlier legislation upon the same subject. See *Wagoner v. Central Platte Nat. Resources Dist.*, 247 Neb. 233, 526 N.W.2d 422 (1995). All existing acts should be considered, and a subsequent statute may often aid in the interpretation of a prior one. *Id.* Based upon that principle of statutory construction, courts have relied upon § 912 to support the conclusion that pursuant to federal statute, rights-of-way created pursuant to the 1875 Act reserved reversionary interests in the United States that have not been subsequently conveyed as part of the adjacent fee. See, *Marshall v. Chicago and Northwestern Transp. Co.*, 31 F.3d 1028 (10th Cir. 1994); *Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330 (9th Cir. 1990); *State of Idaho v. Oregon Short Line R. Co.*, 617 F. Supp. 207 (D. Idaho 1985); *Barney v. Burlington Northern R. Co.*, 490 N.W.2d 726 (S.D. 1992).

On matters of federal law, the decisions of federal courts are highly persuasive, particularly where federal legislative history and the interpretation of federal statutes are at issue. We are persuaded by the reasoning of the 9th and 10th Circuits, set forth above, and likewise conclude that § 912 applies to rights-of-way created pursuant to the 1875 Act and that the import of § 912 is that the United States retains all reversionary interests in such rights-of-way until the United States disposes of those interests as provided by law.

Returning to the circumstances of the instant case, we note that there is no suggestion, or support in the record, for a finding that the Hitchcock County right-of-way has been abandoned within the meaning of § 912. In fact, the record indicates that the railroad is still operating in the right-of-way. Therefore, we conclude that any reversionary interest in the Hitchcock County right-of-way is still possessed by the United States. Obviously,

if Whipps has no interest in the land inside the right-of-way, then Whipps has no claim for relief with respect to any incursion onto that land.

█ Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Soukop v. ConAgra, Inc.*, 264 Neb. 1015, 653 N.W.2d 655 (2002). In this case, there was no genuine issue of material fact, and Level 3 was entitled to judgment as a matter of law regarding the Hitchcock County right-of-way because Whipps had no rights in that property. On that basis, we reject Whipps' first assignment of error and affirm the district court's entry of summary judgment against Whipps with respect to property inside the Hitchcock County right-of-way.

### UNCONSTITUTIONAL TAKING

█ Whipps' second and third assignments of error relate to its claim that it is entitled to damages and attorney fees under §§ 1983 and 1988 for the unconstitutional taking, without compensation, of its property outside the Dundy County right-of-way. Although Whipps argues that its property was taken in violation of both the U.S. and Nebraska Constitutions, this court has analyzed the state constitutional issue whether there has been an unconstitutional taking by treating federal constitutional case law and our state constitutional case law as coterminous. See *Strom v. City of Oakland*, 255 Neb. 210, 583 N.W.2d 311 (1998). Section 1983 provides, as relevant:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1988 provides, as relevant, that prevailing parties in § 1983 actions may be entitled to attorney fees. The threshold

issue, however, is whether Level 3 engaged in "state action," i.e., acted under color of state law, when it trespassed onto Whipps' Dundy County property.

Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the state, its agencies, or officials responsibility for conduct for which they cannot fairly be blamed. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

> Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State. These cases reflect a two-part approach to this question of "fair attribution." First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

*Lugar*, 457 U.S. at 937.

In a case such as this, when the claim of a constitutional deprivation is directed against a private party, a two-part inquiry is required. The first question is whether the claimed deprivation has resulted from the exercise of a right of privilege having its source in state authority. The second question is whether, under the facts of the case, a defendant who is a private party may be appropriately characterized as a "state actor." See *id*. Whipps' argument fails on the first point.

The sole basis identified by Whipps for attribution of Level 3's actions to the state is that Level 3, as a telecommunications company, is authorized by statute to enter upon private lands for surveying, with the power of eminent domain. See Neb. Rev. Stat. § 86-701 et seq. (Cum. Supp. 2002). The failure in Whipps'

argument is that even if Level 3 has been imbued with such power by the state, that power was not exercised in this instance, and none of the damages claimed by Whipps were incurred as a result of any power given by the state to Level 3. Whipps' argument "'overlooks the essential point—that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury.'" See *Lucas v. Wisconsin Electric Power Company*, 466 F.2d 638, 657 n.47 (7th Cir. 1972) (en banc), quoting *Powe v. Miles*, 407 F.2d 73 (2d Cir. 1968).

In *Lucas*, the plaintiff brought a class action, in part, against an electric power company, challenging an administrative policy which permitted discontinuation of service for nonpayment of charges. The plaintiff argued, inter alia, that the actions of the utility were a "state action" because the state authorized the utility to enter private property under certain circumstances. 466 F.2d at 645. The Seventh Circuit rejected the plaintiff's argument, noting that "[i]f that authority were invoked by the defendants in this case, an entirely different issue would be presented. On the record before us, however, it appears that the termination of plaintiff's service can be completed simply by throwing the proper switch or disconnecting the proper wires." *Id.* at 656. The court concluded that the utility's private actions were, therefore, not under color of state law within the meaning of § 1983. *Lucas, supra.* See, also, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974).

Whipps relies on *Ballard Fish & Oyster Co. v. Glaser Construction Co.*, 424 F.2d 473 (4th Cir. 1970), in which the Fourth Circuit found that a natural gas company had acted under color of state law in the construction of a gas pipeline across the plaintiff's oyster beds, even though the gas company had failed to obtain an easement as provided by law. *Ballard Fish & Oyster Co.*, however, is inapposite to the case at bar. The determinative factor in that case was the court's finding that the gas company intentionally took the plaintiff's property "through misuse of the power the state granted it to acquire easements." *Id.* at 474-75. No such intentional misuse of state power is present in the instant case—Level 3 obtained permission from BNSF to use its

rights-of-way in a private transaction and only mistakenly entered onto Whipps' property. In any event, the reasoning of *Ballard Fish & Oyster Co., supra,* appears strained in light of subsequent U.S. Supreme Court decisions. See, e.g., *Blum v. Yaretsky,* 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982); *Jackson v. Metropolitan Edison Co., supra* (fact that business is subject to state regulation does not convert action into that of state).

The inquiry in such cases must be whether " 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' " *Blum,* 457 U.S. at 1004, quoting *Jackson, supra.* The required nexus may be present if the private entity has exercised powers that are traditionally the exclusive prerogative of the state. *Id.* But in this case, Whipps concedes that Level 3 did not exercise, or seek to exercise, any power granted to it by state law to enter private property or exercise eminent domain. The inadvertent entry onto the Dundy County property cannot be ascribed to any governmental decision, and Whipps' claimed deprivation has not resulted from the exercise of a right or privilege having its source in state authority. See *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). The district court correctly concluded that Whipps did not satisfy the "state action" requirement of § 1983 and that Whipps was not entitled to relief under § 1983 or § 1988. Whipps' second and third assignments of error are without merit.

### INVASION OF PRIVACY

Whipps claims that the district court should have awarded damages for an intentional invasion of privacy pursuant to Neb. Rev. Stat. § 20-203 (Reissue 1997). We recently discussed the scope of § 20-203 in *Polinski v. Sky Harbor Air Serv.,* 263 Neb. 406, 412, 640 N.W.2d 391, 396 (2002):

> Section 20-203 provides as follows: "Any person, firm, or corporation that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy." In *Kaiser v. Western*

*R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991), we considered the nature of an intrusion under § 20-203. In *Kaiser*, we described the invasion of privacy as one " 'consist[ing] solely of an intentional interference with [the plaintiff's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.' " 239 Neb. at 631, 477 N.W.2d at 562 (quoting Restatement (Second) of Torts § 652 B, comment *a*. (1977)). We listed the following examples from the Restatement as illustrations of the types of intrusions for consideration as an invasion of privacy under § 20-203: "a reporter's entering a hospital room and taking the photograph of a person suffering from a rare disease; 'window peeking' or wiretapping by a private detective; obtaining access to a person's bank records pursuant to a forged court order; or the continuance of frequent telephone solicitations." *Kaiser*, 239 Neb. at 631, 477 N.W.2d at 562.

Accord *Wilkinson v. Methodist, Richard Young Hosp.*, 259 Neb. 745, 612 N.W.2d 213 (2000). Compare *Sabrina W. v. Willman*, 4 Neb. App. 149, 540 N.W.2d 364 (1995) (photographing woman in tanning booth without her consent fell within scope of statute).

In *Kaiser v. Western R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991), the defendants operated a model airplane field. The plaintiffs, who owned land adjacent to the field, complained that the model airplanes were noisy and continually trespassed over the plaintiffs' land. This court rejected the plaintiffs' claims under § 20-203, concluding that § 20-203 was not "designed to protect persons from the type of alleged intrusion involved in this case." *Kaiser*, 239 Neb. at 631, 477 N.W.2d at 562.

 Although the intrusions in the instant case are more substantial than those alleged in *Kaiser, supra*, the same distinction is present between a mere trespass and the intrusion into " ' "private affairs or concerns," ' " *id.* at 631, 477 N.W.2d at 562, at which § 20-203 is directed. While Level 3's entrance onto Whipps' property was intrusive and the Whipps had every right to be upset about the resulting disturbance, the circumstances of Level 3's incursion presented a classic case of common-law trespass, for which damages were awarded. Trespassing onto real property,

without more, is simply not the form or magnitude of interference into a person's solitude or seclusion that would rise to the level of being highly offensive to a reasonable person, such as might be actionable under § 20-203. See, *Polinski, supra*; *Wilkinson, supra*; *Kaiser, supra.* The district court correctly rejected Whipps' theory of recovery based on § 20-203. Whipps' assignment of error to the contrary is without merit.

INJUNCTIVE RELIEF

 Whipps' final argument is that the district court should have entered injunctive relief against further trespassing by Level 3.

This court stated in *Sillasen v. Winterer*, 76 Neb. 52, 54, 107 N.W. 124, 125 (1906), that "the rule is firmly established in this state and elsewhere that, where the nature and frequency of trespasses are such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land, an injunction will be granted." We also stated in *Thomas v. Weller*, 204 Neb. 298, 304, 281 N.W.2d 790, 793 (1979), that "[c]oncerning simple acts of trespass, equity has, in most cases, no jurisdiction, but if the nature and frequency of trespasses are such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land, an injunction will be granted." *Harders v. Odvody*, 261 Neb. 887, 896, 626 N.W.2d 568, 575 (2001). The record in this case indicates that Level 3's trespasses onto the Dundy County property were inadvertent and ceased as soon as Level 3 became aware of its mistake. The record provides no basis for concluding that Level 3 will engage in any future trespassing, much less trespassing of such a "nature and frequency . . . such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land." See *id.* Whipps simply argues that "there is no reason to believe that Level 3 will not engage in similar behavior in the future." Brief for appellants at 35. This assertion is insufficient to warrant the "extraordinary remedy" of injunctive relief. See *Harders*, 261 Neb. at 895, 626 N.W.2d at 575. The district court did not err in failing to enter an injunction, and Whipps' final assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the district court's judgment in the sum of $3,500 for trespass on the Dundy County property is affirmed.

AFFIRMED.

CONNOLLY, STEPHAN, and McCORMACK, JJ., not participating.